679 A.2d 470 (1996)
In re A.R., D.B., Appellant.
No. 94-FS-1260.
District of Columbia Court of Appeals.
Argued February 16, 1996.
Decided June 20, 1996.
*471 Lewis Franke, Washington, DC, for appellant D.B.
Yvonne B. Lewis, Springfield, VA, for appellee A.R.
Before TERRY, SCHWELB and KING, Associate Judges.
SCHWELB, Associate Judge:
In June 1994, following a two-day factfinding hearing, the trial judge terminated the parental rights[1] of the father and mother of appellee A.R., a boy who was then six years of age. On appeal, the father, who is the sole appellant, contends primarily that the judge abused her discretion in terminating his rights because she did not interview A.R. and because she failed to ascertain A.R.'s opinion of his own best interests. We affirm.

I.

THE FACTS

A. A.R.'s History.
A.R. was born on December 4, 1987. His mother is a paranoid schizophrenic who has abused unlawful drugs, engaged in assaultive conduct against social workers, and contemplated suicide. A.R.'s father has been convicted, inter alia, of distribution of cocaine, and he has been incarcerated for substantial portions of his son's life.
On August 30, 1990, the District filed a neglect petition in the Superior Court alleging that A.R., then two and a half years old, had been found on the corner of Fourteenth and Swann Streets, N.W., without adult supervision. At that time, the whereabouts of A.R.'s father were unknown. The mother stipulated that A.R. was a neglected child because her mental illness precluded her from caring for him adequately. A.R. was placed in shelter care, and he was subsequently committed to the custody of the Department of Human Services (DHS).
In late 1990, through the offices of the Methodist Board of Child Care, A.R. was placed in the foster home of Mrs. Fay Dent and her husband, Reginald Dent. Mrs. Dent, an articulate woman of considerable sophistication,[2] testified movingly about A.R.'s condition when he came to her home. She explained that, although he was two years and ten months old, he was unable to speak and "babbled like an infant." A.R. was not yet toilet-trained, and he was unfamiliar with eating utensils. Indeed, "[w]hen he would try to drink out of a cup he would literally turn it upside down and the liquid would cover his nose and then he would choke." He ate hurriedly, "like a child who had not had anything to eat on a regular basis." A.R. was found to be hyperactive, and he suffered from attention deficit disorder.
The Dents introduced A.R. to a regimen of structure and love, and he received medication as well as occupational, physical and speech therapy. He also had the opportunity to play with the four other children in the home. A.R. soon showed dramatic improvement. Mrs. Dent testified that
A.R. went into a normal kindergarten class and he was able to excel like a little king so to speak. . . . He went in, he stayed on task with the class, he received progress reports that said outstanding student, good working habits. When he left, [to go] to the new place, he actually was at the top of his class.
The Dents had hoped to adopt A.R. In August 1991, however, Mr. Dent suffered a massive heart attack. He became disabled, and the family's financial situation deteriorated. Mrs. Dent testified that, for these reasons, the Dents felt unable to go through with their plans for adoption. Mrs. Dent stated that, in her view, A.R. was an adoptable child.
In December 1993, A.R. was moved to a "preadoptive" home with Ricky and Aleta Armstrong. This placement, however, *472 proved unsuccessful, apparently because A.R. did not regularly receive the medication which had been prescribed to control his hyperactivity and his attention deficit disorder. In April 1994, it came to the attention of DHS, inter alia, that A.R. had been assaulting younger children and stealing and hoarding food, that he had poured calamine lotion on the rug, and that he had tried to choke the family's pet rabbit.
On May 19, 1994, A.R. was moved to a new preadoptive home with the Harris family. The Harrises live near the Dents, and they knew A.R. from his three-year sojourn in the Dent household. A.R. received his medication regularly, and his behavior promptly improved. A DHS social worker testified that the new adoptive family "is definitely able to meet [A.R.'s] needs" and that "this is the perfect family for him right now." The judge found that, as a result of this move, "life turned around for A.R." At the time of the hearing, however, A.R. had been with the Harrises for only one month. The social worker acknowledged that she had visited the Harris home only once, that the other children were at school at the time of her visit, and that she had therefore been unable to observe A.R.'s interaction with them.

B. The Biological Parents' Relationship With A.R.
During the period that A.R. was living with the Dents, he received occasional visits from his mother. These visits apparently upset him, and there was testimony that he regressed in his behavior in their wake and that he reverted to bed-wetting. At the time of the hearing, the mother was living in a shelter in New York City. She presented no evidence and has not joined this appeal.
The father contacted one of the social workers by telephone in the spring of 1992[3] and expressed interest in visiting A.R. Neither he nor the social worker followed up on the contact, and it appears that the father was again incarcerated soon thereafter. The father next contacted DHS in June 1994, a few days before the hearing on the motion to terminate parental rights. Once again, the father expressed the hope that he could visit his son.
The social worker declined to arrange a visit. She explained her refusal by claiming that contact with the father would have upset A.R. because he had been moved to the home of the Harris family only a short time earlier. The social worker also indicated that she wished to defer a decision on the proposed visit until after the TPR motion had been decided.

C. The Trial Court Proceedings.
On April 7, 1993, A.R.'s guardian ad litem (GAL) filed a motion to terminate the parental rights of the father and of the mother. There was considerable delay in bringing the motion to trial because the father's whereabouts were unknown. A fact-finding hearing was ultimately held on June 17 and 20, 1994.
Mrs. Dent and three social workers who had been assigned to A.R.'s case testified at the hearing. Collectively, their testimony was as summarized above.
At the conclusion of the GAL's case, the father's attorney orally moved for judgment, contending that the GAL had failed to prove by clear and convincing evidence that a TPR was in A.R.'s best interest. He first argued that there was insufficient evidence that A.R. had been integrated into the Harris home. The judge rejected the contention that such proof was necessary, noting that
the child doesn't have to be currently integrated. He has to need to be integrated. And, if the need is there he could have no placement whatsoever. He could be sitting around in a group home or some such place waiting to be placed. So, we don't need all that evidence about how well he is doing at the Harris[es].
Counsel for the father then argued that the GAL's proof was insufficient because the statute requires, "to the extent feasible[,] a child's opinion of his or her own best interests *473 in the matter[,][and][w]e have no evidence on that." The judge disagreed:
There is nothing in our law that says that unless a child is brought to court and testifies in a courtroom about his interests that a termination of parental rights can't be or shouldn't be granted. Neither of those cases[[4]] stands for that proposition. It says it is good to take direct evidence on that question, but it doesn't say that it is fatal if you don't.
* * * * * *
I know and you know, we all know the enormous burden that we place on children when we ask them to come and say, gee, I think really you ought to cut off my mother's rights. Psychologically it is harmful to children, and I am not here to insist on that being the only way to go about learning something on that factor.
The father's attorney then suggested that the judge could have or should have interviewed A.R. informally in chambers. The judge rejected this suggestion too:
My point is this, no Court of Appeals can require me to take children into chambers off the record and chat with them. I have said as many times as anybody will listen to me, it is inappropriate in my view. I know lots of my colleagues do it, but I won't do it because I have read enough articles and been told by enough experts even in court, of what we do to children when we say ... with no expertise whatsoever in talking to children  gee, son, who[m] would you like to live with, how do you feel about being adopted, et cetera.. . . .
COUNSEL FOR THE FATHER:
There may be ways 
THE COURT: I am not skilled in doing it, and I will not do it. Now, if you lawyers want to call a child in a case you are perfectly free to do that.
The trial judge denied the father's motion for judgment.[5] Neither the father nor the mother took the witness stand, and each rested without presenting any evidence.
The judge made detailed oral findings at the conclusion of the hearing. After summarizing the testimony, the judge observed that the social workers had done "[nothing] to encourage ... or assist the father in even visiting the child, let along reuniting [with him]," apparently because "the [agency's] goal had changed to adoption." She then proceeded to analyze the evidence in terms of the factors set forth in the TPR statute. See D.C.Code § 16-2353(b) (1989 & 1995 Supp.).[6] The judge stated:
The court is to take into consideration the need of this child ... to be integrated into a stable home environment where he can receive consistent care.
The child's need for stability, and continuous and consistent care is enormous. He comes into this world with an attention deficit disorder, a child who needs lots and lots of structure. He has had one, two, three ... placement[s] at least [since] he was at home with his mother. . . . He was with the Dents. He was with the Armstrongs, and now he is with the Harrises. *474 He needs continuous care, and continuity of care, and integration into a stable and permanent home more than most children do.
The court is next to take into consideration the physical, mental and emotional health of all of the individuals involved. It appears that all of the caretakers seem to be emotionally healthy, and mentally healthy although Mr. Dent was not physically healthy....
Clearly the mother has mental health problems and there is no evidence that those problems have abated. The father appears to be physically, and mentally and emotionally healthy, although he has been physically unavailable in the past when he was incarcerated.
The court takes into consideration the quality of the interaction and interrelationship [of] this child with all the relative adults and siblings. Again, I say this child does not have much of an interaction, interrelationship with his father in part, [a] little bit, because of the agency's unwillingness to assist him, but in very large measure because he was unavailable, and he simply dropped out of this child's life. . . .
We know a little bit about the interrelationship and interaction between the child and its current caretaker. That seems to be going well according to the witnesses, although we don't know how he is doing with his siblings in the home that he is in.
He is placed in a preadoptive home, as I say, and it is the plan of those parents to adopt the child, although they haven't petitioned yet, and we don't know very much about how things are going except that they have improved a lot. His behavior seems to be better managed.
We know nothing about the child's opinion of his own best interests and it is clear that the child is capable, at least from what I know, of expressing himself. He is able to say what he thinks about all of this. He is old enough presumably to understand what it means not to ever see his mother or father again, his natural mother and father, and to be asked what he wants. He hasn't been asked and I am taking that factor into consideration, although you have heard me comment on how tough it is on children, especially young ones[,] and on the fact that I don't think [the child's failure to testify] [is] fatal.
In the end, we have got a child who has enormous needs we think are being met, we know can be met, that are better met if his parents['] rights, what legal rights they have[,][are] terminated. And, so it is therefore clear and convincing on the record that it is in A.R.'s best interest to terminate the parent[-]child relationship of both his mother and his father.
The father filed a timely appeal.

II.

LEGAL DISCUSSION

A. The Standard of Review.
"The legal touchstone in [a] proceeding to terminate parental rights is the best interest of the child, and that interest is controlling." In re A.B.E., 564 A.2d 751, 754 (D.C.1989). "Termination of parental rights is a drastic remedy, which should be ordered only upon a showing of clear necessity." In re Application of L.L., 653 A.2d 873, 887 (D.C.1995) (citations and internal quotation marks omitted). The moving party must demonstrate by "clear and convincing evidence that termination of the parent and child relationship is in the best interest of the child." D.C.Code § 16-2359(f) (1989). The trial court's determination as to whether this standard has been met is reviewable only for abuse of discretion. In re D.R.M., 570 A.2d 796, 803 (D.C.1990). The trial judge has wide latitude in applying the statutory criteria set forth in Section 16-2353(b). See T.W., supra note 4, 623 A.2d at 117 (citation omitted).

B. The Father's Position.
The father's primary contention on appeal, as stated in his brief, is that the trial judge "erred in refusing to consider [A.R.'s] opinion as to what his best interests are." This proposition, if read literally, is based on a fallacious premise. The judge did not refuse to consider A.R.'s opinion. There was no evidence in the record regarding that opinion, *475 and she could not have refused to consider that which was not there.[7] In fact, the judge unequivocally stated, while entertaining argument on this issue, that the parties were "perfectly free" to present evidence with regard to the child's opinion, and that counsel could call the child as a witness if they elected to do so. The judge was thus plainly aware of the provision in the statute requiring her to consider, "to the extent feasible, the child's opinion of his or her own best interests in the matter." See D.C.Code § 16-2353(b)(4). There is no reason to believe that she would have declined to consider evidence of that opinion if such evidence had been introduced at trial.
Although we cannot accept the father's formulation of the question before us, however, we are not prepared to reject his substantive contentions on the basis of their imprecise articulation. "[G]iven the historic concern of the courts with the welfare of minors, ... any court is properly reluctant to penalize a juvenile for procedural defaults, especially those of his attorney." Fulwood v. Stone, 129 U.S.App.D.C. 314, 317, 394 F.2d 939, 942 (1967); see also In re L. W., 613 A.2d 350, 352-53 n. 6 (D.C.1992).
The father's submission could reasonably be construed as embracing either or both of two distinct (but related) arguments, each of which his attorney presented, at least in some measure, to the trial court:
1. that the judge abused her discretion in the conduct of the trial by refusing to interview A.R. or to ascertain A.R.'s opinion in some other way; and
2. that the judge abused her discretion by deciding the case against the father, and by terminating the father's rights, without evidence in the record of A.R.'s opinion of his own best interest.
We will assume for purposes of the present appeal that both points have been preserved.

C. Abuse of Discretion in the Conduct of the Trial.

(1) The statute.
Noting that Section 16-2353(b)(4) requires the court to consider, "to the extent feasible," the child's opinion of his best interests, the father apparently contends that if evidence as to the child's opinion is not adduced by the parties, then the trial judge has an independent affirmative obligation to elicit such evidence, either from the child or from other witnesses. The father relies, inter alia, on this court's statement that "it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so." I.B., supra note 4, 631 A.2d at 1232 (citing T.W., supra, 623 A.2d at 117).
We think the father's argument confuses the judge's undoubted statutory duty to consider the evidence in the record relating to the child's opinion with a purported (and far more controversial) obligation to investigate the case on the judge's own initiative, and to create an expanded evidentiary record if the judge is dissatisfied with the record which the parties have made. The second obligation cannot be found in, or reasonably inferred from, the language of the statute. To create such an obligation would be contrary to the normal functioning of the adversarial system, and would transform the judge's role into one reminiscent of the "inquisitorial" system utilized in "civil law" jurisdictions whose traditions are based on the Roman law rather than on the common law. See MARY ANN GLENDON ET AL., COMPARATIVE LEGAL TRADITIONS 13, 91-92 (1982).
In common law "adversarial" jurisdictions, "the development of the facts is a task primarily assigned to counsel." Mack v. United States, 570 A.2d 777, 782 (D.C.1990). "[U]nder our system of laws, a judge is not an investigator; the investigative function belongs to the parties and their agents." Davis v. United States, 567 A.2d 36, 42 (D.C.1989) (per curiam). These principles are deeply embedded in the warp and woof of our law, cf. In re W.L., 603 A.2d 839, 846 n. 6 (D.C.1991) (concurring opinion), and a statute should not be construed as overruling them unless such an interpretation is compelled by *476 its language and structure. Nothing in Section 16-2353(b) suggests a legislative disposition to effect such a dramatic change in the judge's function. We therefore conclude, contrary to the father's argument, that the judge did not violate the TPR statute by declining either to interview A.R. in chambers or to attempt to expand in some other way the evidentiary record presented to her by the parties.

(2) Parens patriae.
We recognize, however, that a child custody case is not a run-of-the-mill dispute in which only the parties' interests are implicated. "Upon [the judge's] wisdom, insight and fairness [in cases such as this] rest[s] the future happiness of [her] wards." Lincoln v. Lincoln, 24 N.Y.2d 270, 299 N.Y.S.2d 842, 843, 247 N.E.2d 659, 660 (1969). Accordingly, the court acts as parens patriae on the child's behalf, and "should do her (or his) best to obtain all of the information needed to effect a judicious disposition." L.W., supra, 613 A.2d at 353 n. 6. A trial judge is not a mere moderator but a "functionar[y] of justice," United States v. Liddy, 166 U.S.App.D.C. 95, 105, 509 F.2d 428, 438 (1974), cert. denied, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975) (quoting Johnson v. United States, 333 U.S. 46, 54, 68 S.Ct. 391, 395-96, 92 L.Ed. 468 (1948) (Frankfurter, J., dissenting in part)), and this is especially so where parens patriae responsibilities come into play. Accordingly, in child custody cases, "limited modifications of the traditional requirements of the adversary system must be made, if necessary." Lincoln, supra, 299 N.Y.S.2d at 843, 247 N.Ed.2d at 660. As we noted in Perry v. United States, 364 A.2d 617 (D.C.1976),
[t]he adversary nature of the proceeding does not relieve the trial judge of the obligation of raising on his own initiative... matters which may significantly promote a just determination of the trial. ABA Standards, The Function of the Trial Judge § 1.1 (1972).
Id. at 620 n. 4 (alteration in original) (quotation marks omitted).
We further explained, however, immediately after the quoted passage in Perry, that "[t]he extent to which the judge will intervene for this purpose is a matter of the trial judge's discretion." Id. "Our prior decisions contain no suggestion that the statute makes indispensable the child's direct testimony about her opinion on whether the parental bond should be severed." T.W., supra, 623 A.2d at 117 (citation omitted).
The decision whether or not to question A.R. in camera was discretionary in character. "In most states, judges have discretion concerning whether or not to interview a child," and "a party usually cannot require a judge to [do so]." 2 JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICE § 11.32, at 639 (1986) (footnotes omitted). "The majority of cases ... have held that the court may question a child privately only with the consent of the parties." 2 JOHN P. McCAHEY ET AL., CHILD CUSTODY & VISITATION LAW AND PRACTICE § 12.043, at 12-20 & n. 31 (1996) (citing authorities).[8] In the present case, the GAL did not consent to such an interview; indeed, she was never asked to consent. Further, counsel for the father did not request the court to speak to A.R. in camera; rather, he demanded, after the fact, that the motion for a TPR be denied, in part because the judge had not interviewed the boy.
Turning to the substance of the court's exercise of discretion, the judge provided a detailed and "common sense" explanation for declining to question A.R. in camera. She explained that, in her view, such an interview would place undue pressure on A.R. and would risk the infliction of significant emotional harm. The judge believed that she lacked the necessary training and skills to conduct such an interview without imperiling A.R.'s psychological well-being.
The judge's concerns were eminently reasonable.

*477 Like attorneys, judges vary in their level of comfort in talking to children . . .  particularly young children  because they do not believe they have sufficient skills to talk with children about the issues. Other judges seek to avoid talking to children because they do not want the children to feel pressured or to feel that they will be the ones to decide who[m] they will live with. Judge Gladys Kessler, Presiding Judge of the District of Columbia Superior Court,[[9]] [Family] Division, commented: "No matter how hard [you try to tell the child] that the decision is not his decision, the child still thinks it's his decision".
2 ATKINSON, supra, § 11.33, at 641 (footnotes omitted) (final alteration in original).[10] The judge wisely recognized that it would not be in A.R.'s interest for her to attempt a procedure which she did not feel competent to perform.
We recognize that, in this case, there was no information in the record from any source regarding A.R.'s opinion of his own best interest. Compare I.B., supra, 631 A.2d at 1231 and T.W., supra, 623 A.2d at 118 n. 8. From that perspective, there was more reason than in I.B. or in T.W. for the judge to interview A.R. in camera. Accordingly, neither of those decisions is precisely in point.
The reality is, however, that in this case the six-year-old respondent could have provided the court, at best, with rather abstract information about his preference. Assuming, as the judge did, that A.R. was old enough to express an opinion on the subject, that opinion would have been severely limited by A.R.'s lack of contact with the principals. Although A.R. could theoretically have told the judge that he wanted to reunite with his natural father, or to develop a relationship with him, that potential relationship would have been with a stranger. As the judge expressly found, A.R.'s father had "dropped out of his life." A.R. did not even know him. A.R. would have been talking about a hypothetical father, rather than about his "real" one.
Moreover, A.R. could have provided only limited information regarding his feelings about a possible adoption. No petition to adopt A.R. was pending. Even if we were to assume that the Harrises would eventually seek to adopt him, anything A.R. could have said about them at the trial in this case would have been based upon a single month's acquaintance with them. By contrast, in the event that the Harrises should seek to adopt A.R. at some time in the future, the judge in that hypothetical proceeding will have the opportunity to obtain the boy's opinion, which will by then be based on far more extensive information and experience.
In sum, we conclude that the judge did not abuse her discretion when she refused to risk the psychological harm which she apprehended A.R. might suffer as a result of an in camera interview. Rather, she acted conscientiously in conformity with her reasonable view of the best interest of the child.
The father also asserts in his brief that the judge "could have solicited testimony from social workers in this case regarding indications of the child's wishes and opinions." The interrogation of witnesses, however, is primarily the responsibility of counsel, not of the judge. No party suggested to the judge at the appropriate time that she ask questions of those social workers who testified, or that she call as the court's witness any person who was not called by the *478 parties.[11] Accordingly, we review only for plain error. Under that standard, the father must demonstrate that it was "obvious" error for the judge to fail, on her own initiative, to propound questions that counsel could have asked, or to call witnesses whom counsel could have called; he must also show that a miscarriage of justice resulted. See, e.g., Foote v. United States, 670 A.2d 366, 369 (D.C.1996); District of Columbia v. Banks, 646 A.2d 972, 978 (D.C.1994). The father has made no such showing.

D. Abuse of Discretion in Disposition of the Case.
In the trial court, the father argued that the GAL's motion for a TPR should be denied because there was no information in the record regarding A.R.'s opinion as to his own best interest. Although it is not altogether clear that the father is reiterating this argument on appeal,[12] we are prepared to treat his submission in this court as preserving this contention. See Part III B., supra.
A TPR, as we have noted, is a drastic remedy. It severs forever all of the ties between parent and child. The burden on the moving party is therefore a heavy one. The GAL must demonstrate by clear and convincing evidence, see D.C.Code § 16-2359(f), that it is in A.R.'s best interest to terminate his relationship, actual or potential, with someone who brought him into this world. If the TPR in this case is affirmed, then in the eyes of the law, this son no longer has a father.
One of the specific criteria set forth in the statute for determining whether parental rights should be terminated is the child's opinion regarding his own best interest. Where, as here, the judge has made no finding regarding that issue and the record is barren of any evidence with respect to it, we think it incumbent upon the appellate court to scrutinize the record critically. We must be sure that the TPR was providently issued, in A.R.'s best interest, notwithstanding the absence of any evidence as to A.R.'s opinion. We have no doubt that, in the generality of cases, termination is much less troubling if the child's opinion is before the court, and if a finding has been made with respect to it. Our prior cases have implied as much, see, e.g., I.B., supra, 631 A.2d at 1230-32 (citing authorities), and common sense reinforces the point.
Nevertheless, as the father's attorney explicitly conceded in the trial court, the absence of evidence regarding the child's opinion of his own best interest is not dispositive.[13] The criteria set forth in section 16-2353(b) are not comparable to the elements of a criminal offense. A TPR may be entered if the moving party has prevailed with respect to some but not all of the statutory factors. In some cases, the evidence with respect to one factor may point in one direction, while the evidence as to a second factor may suggest a contrary *479 disposition. The judge's responsibility is to consider the evidence in the record with respect to all of the statutory criteria. He or she must balance all of the relevant considerations, and choose between the available alternatives, all of which may well be less than perfect. The judge must do all of this with a single goal in mind, namely to protect and promote the best interest of the child. A child custody case thus demands the paradigmatic discretionary call, often a very difficult one. See In re Petition of D.I.S., 494 A.2d 1316, 1323 (D.C.1985) (citations omitted). There is no single litmus test. Each case must be decided on its own facts.
In some circumstances, the lack of information as to a child's preference may loom very large indeed. If, for example, A.R. were sixteen years of age, and if he were well-acquainted with his father and with his prospective adoptive parents, it would be difficult to imagine how a court could appropriately terminate the father's rights without meaningful input from the teenager whose future hangs in the balance. Without any information as to the boy's opinion, the evidence supporting a termination of all ties between father and son could rarely be viewed as "clear" or "convincing." One would expect, in such a case, that the party whose position would be enhanced by disclosure of the boy's preference could find a way to present the information to the court. But even in such a case, the youngster's preference, though important, is not necessarily dispositive. See 1 ATKINSON, supra, §§ 4.44-4.46, at 295-99.
At the time of the fact-finding hearing in this case, A.R. was not sixteen years old, but six.[14] To be sure, in the trial judge's view, A.R. was "old enough presumably to understand what it means not to ever see his mother or father again ... and to be asked what he wants." Nevertheless, as we have noted, A.R.'s father had dropped out of the boy's life, and A.R. did not know him at all. An impartial judge could reasonably conclude that in these circumstances, the lack of any record information regarding A.R.'s opinion of his own best interest should not, standing alone, preclude termination of the father's rights. Indeed, the father's counsel has not argued, either in the trial court or on appeal, that the absence of evidence on this statutory factor is dispositive.

III.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is
Affirmed.[15]
*480 TERRY, Associate Judge, dissenting:
I respectfully dissent from my colleagues' affirmance of the TPR order. I think the trial judge erred in failing to consider the child's opinion of his own "best interests in the matter," as required by D.C.Code § 16-2353(b)(4) (1995 Supp.), even though the child was concededly old enough (about six and a half at the time of the hearing) to have such an opinion. Indeed, the judge expressly said that she would not consider the child's views because she refused to "take children into chambers off the record and chat with them." It is clear from both In re T.W., 623 A.2d 116 (D.C.1993), and In re I.B., 631 A.2d 1225 (D.C.1993), that a judge need not speak directly with the child, provided that there is other, indirect evidence of the child's opinion. Thus we affirmed a TPR order in In re I.B., for example, because "the record of the three-day TPR hearing [was] replete with references to the children's opinions," 631 A.2d at 1231, and because the trial judge made findings about those opinions in the course of his ruling. In this case, however, there was neither direct nor indirect evidence of the child's opinion, a deficiency which in my view precludes affirmance.
I am also quite troubled by the judge's announcement of her own unwavering policy of never talking to children in cases such as this. Such a refusal to exercise discretion is itself an abuse of discretion, unless there is some other means of obtaining the needed information, as there was in In re I.B. It was this sort of rigidity that led to reversal, for example, in Springs v. United States, 311 A.2d 499, 501 (D.C.1973), and again in Johnson v. United States, 398 A.2d 354 (D.C. 1979). As we said in Johnson:
Failure to exercise choice in a situation calling for choice is an abuse of discretion. . . . Similarly, when the trial court recognizes its right to exercise discretion but declines to do so, preferring instead to adhere to a uniform policy, it also errs.
Id. at 363 (citations omitted). I would reverse on this ground as well.
NOTES
[1] We refer to termination of parental rights in this opinion as TPR.
[2] In addition to her activities as a foster parent, Mrs. Dent was employed as a child intake worker with the Social Services Division of DHS.
[3] The judge understood this contact to have occurred in April 1994, but the social worker referred to the earlier date.
[4] Counsel for the father had cited In re T.W., 623 A.2d 116 (D.C.1993), and In re I.B., 631 A.2d 1225 (D.C.1993).
[5] The judge also denied a similar motion made on behalf of the mother.
[6] Section 16-2353(b) provides in pertinent part:

(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; [and]
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter.
We have not quoted sub-sections (3A) and (5), dealing respectively with "boarder babies" and with continuing drug-related activities in the child's home, because neither of these provisions has any application here.
[7] There was evidence that A.R. regressed to bed-wetting following visits from his mother, and that contact with her made A.R. tense. That evidence has no bearing on A.R.'s preferences as to his father, with whom he has had no contact at all.
[8] The authorities are divided with respect to whether the judge may conduct such an in camera interview over one party's objection. Compare Ex parte Wilson, 450 So.2d 104, 106 (Ala. 1984) with Lincoln, supra, 299 N.Y.S.2d at 843-44, 247 N.E.2d at 660-61. We need not and do not decide that question.
[9] Judge Kessler is now a United States District Judge.
[10] Mr. Atkinson provided the following illustration:

Judge Stephen Lachs, Presiding Judge of the Los Angeles County Superior Court Domestic Relations Dep[artment], commented in an interview with the author: "You don't see toys and dolls in my chambers, and I don't feel very confident at sitting a child down and saying things like `Now, Johnny, let's imagine you've got a special rocket to the moon, but it can only hold two people. Who[m] would you like to bring along?'" Judge Lachs said if he needed special insight on the child's feeling, he would have the child evaluated by a mental health professional.
Id. at 641 n. 121. In the present case, neither party suggested that the judge order an evaluation of A.R. by a mental health professional, and the father has not claimed on appeal that it was plain error for the judge to fail to do so sua sponte.
[11] After the GAL had rested, and after the witnesses had completed their testimony, the father's attorney argued in a general way that there were means by which the judge could have ascertained A.R.'s opinion from witnesses other than A.R. Counsel did not, however, ask the judge to call or re-call any witnesses; he argued, instead, that without such testimony, the GAL's evidence was insufficient to warrant the issuance of a TPR. The father cannot now be heard to argue that witnesses should have been called or recalled. See D.D. v. M.T., 550 A.2d 37, 48 (D.C.1988); see also I.B., supra, 631 A.2d at 1232 n. 11.
[12] The father has not argued on appeal that the evidence as a whole was insufficient to support the issuance of a TPR. He has contended, to quote his brief, that "[t]he trial judge erred by not making a specific finding that [the] child was adoptable and in any event the evidence presented was contrary to such a finding." By challenging the sufficiency of the evidence only as to the limited issue of adoptability, the father could plausibly be viewed as having disclaimed any other sufficiency claim.
[13] Counsel's position was as follows:

Your Honor, I am not saying this is fatal to this case. I am saying it is one of the factors to be considered. The statute specifically says to the extent feasible the child's opinion of his own interest in the matter. We have no evidence of that. There have been cases where the Court of Appeals has indicated that it is appropriate to get opinions of children if not directly, indirectly. And, also I am saying that in this case, we could have done something. We don't do it and I am not saying that it is fatal to this case, but it is lacking. Clearly lacking. That's all I am saying, Your Honor.
(Emphasis added).
[14] "If [the] child is young or does not have a good reason for the preference, the preference either will not be followed or will be given little weight." 1 ATKINSON, supra, § 4.46, at 298. In In re Marriage of McKeever, 117 Ill.App.3d 905, 73 Ill.Dec. 164, 167, 453 N.E.2d 1153, 1156 (1983), the court found no abuse of discretion in the trial court's refusal to interview a six-year-old boy who was the subject of a custody dispute, in the absence of any showing that he was especially mature for his age.

The child's chronological age, however, is not necessarily conclusive. "Children as young as four years old have had their preferences followed with their desires called an `important factor,' and children as old as fourteen have not had their preferences followed." 1 ATKINSON, supra, § 4.44, at 295-96 (footnotes omitted).
[15] The father's remaining contentions  that the judge failed specifically to find that A.R. is adoptable, and that the evidence would not support such a finding  can be dealt with summarily. In denying the father's motion for judgment at the conclusion of the GAL's case, the judge stated:

[Mrs.] Dent is proof that the child can bond.... [Mrs.] Dent has proved that . . . the child is adoptable.... Anyway, Mrs. Dent has proved that someone has loved this child enough and would be willing to care for the child enough to adopt him[,] but for a massive heart attack, right. So he is adoptable. He has bonded in the past with people. His behavior has actually been better regularized now.
No evidence was admitted after the judge made this ruling, and there was no need for her to repeat it in her formal findings of fact.
We cannot second-guess the judge's determination that Mrs. Dent's uncontradicted testimony was credible, and the finding that A.R. was adoptable is fully supported by the evidence. See In re S.G., 581 A.2d 771, 774-75 (D.C.1990). Moreover, as the judge explicitly recognized, a TPR may properly be entered even where no specific adoptive parents have been identified, where the child is adoptable and termination would enhance the child's prospects for an appropriate adoptive placement. See, e.g., In re A.W., 569 A.2d 168, 172-73 (D.C.1990).