855 A.2d 1091 (2004)
In re Petition of H.B.; R.W., Appellant.
No. 03-FS-269.
District of Columbia Court of Appeals.
Argued May 27, 2004.
Decided July 22, 2004.
Joanne Schamest, appointed by the court, for appellant.
Marion E. Baurley, Washington, DC, appointed by the court, for appellant, H.B.
Robert J. Spagnoletti, Corporation Counsel, Edward E. Schwab, Deputy Corporation Counsel, and Stacy L. Anderson, Assistant Corporation Counsel, filed a statement in lieu of brief, for the District *1092 of Columbia.[1]
Before STEADMAN, FARRELL and WASHINGTON, Associate Judges.
WASHINGTON, Associate Judge:
Biological mother R.W. appeals the adoption of her son D.W. by H.B., his maternal aunt. First, R.W. contends that the trial court erred by staying the adoption petition for six months, rather than dismissing it, after concluding at that point that it lacked clear and convincing evidence to support waiving her consent to the adoption. Second, R.W. argues that the trial court abused its discretion when it granted the adoption petition six months later. We affirm.

BACKGROUND
D.W., the subject of the adoption petition, was born on July 31, 1995, to birth mother R.W., then thirty-three years old and the mother of two other childrena daughter named I.R. who was born on February 14, 1978, and a son named A.R., whose date of birth is unknown. According to the interim report prepared for the trial court by the District of Columbia Child and Family Services Agency ("CFSA"), D.W. lived with R.W. from the time he was born until August 13, 1996, when he first came to the attention of the CFSA. At the time, R.W. was suffering a nervous breakdown related to the recent deaths of her oldest son, A.R., and both A.R. and I.R's father. CFSA received a report that the birth mother R.W. was using crack cocaine and wandering the streets with D.W. at all hours of the day and night. R.W. had also reportedly left D.W. alone in her apartment on a number of occasions. Following an altercation with her teenage daughter, I.R., R.W. was taken by police to the Emergency Psychiatric Response Division and later admitted to Saint Elizabeths Hospital. While R.W. was receiving treatment at Saint Elizabeths, CFSA instituted a neglect proceeding. Following an emergency neglect hearing on September 10, 1996, D.W. was sent to live with R.W.'s half-sister, H.B. To date, D.W. has remained in this "temporary" placement.
Initially, R.W. had unsupervised weekly visits with her son. These visits, however, did not go smoothly and, as a result, the court ordered that the visits be supervised. On August 31, 2000, the neglect judge terminated R.W.'s visitation rights altogether, based on an ex parte report submitted by CFSA social worker Clayton Spitzer, which described R.W. as behaving in an "abnormal and potentially dangerous" way. On December 15, 2000, the neglect judge issued a no-contact order directing R.W. to stay away from both H.B. and D.W. In April 2001, R.W. petitioned the court for visitation; however, the neglect judge denied her motion on August 13, 2001.
H.B. filed a petition for adoption on August 22, 2001. On February 15, 2002, the trial court issued an order directing each of D.W.'s parents to show cause why his or her consent to the proposed adoption should not be waived. Although D.W.'s putative father D.S. signed a waiver of rights and denial of paternity, his mother R.W. was opposed to the adoption and refused to sign the consent. As a result, a show cause hearing was held on May 28 and May 29, 2002 to determine whether R.W.'s consent to the adoption could be waived.

*1093 1. The Show Cause Hearing

On May 28, 2002, the trial court heard testimony from the following individuals: CFSA social worker Clayton Spitzer, petitioner H.B., respondent R.W., and R.W.'s now grown daughter I.R. Clayton Spitzer, who had served as case manager since October 1998, testified in favor of the adoption; however, as the trial court recognized, his testimony was more favorable to the mother than it was to waiving her consent. On cross-examination, Spitzer admitted that he had lost a good portion of the notes he had taken following his encounters with birth mother R.W. Further, he testified that it appeared that R.W. had completed the Harbor Lights drug rehabilitation program in addition to a course on anger management. He was also aware that R.W. regularly attended both NA and AA meetings, brought birthday gifts and cards for D.W., and to his knowledge, had a good relationship with her son D.W. In recommendation of H.B. as an adoptive parent, Spitzer testified that he had visited her home and found it to be a "very pleasant, single-unit home with bedrooms and nicely furnished and a comfortable living situation." A review of D.W.'s medical records indicated that D.W. was healthy and up-to-date on all his immunizations. Spitzer also testified that D.W. was doing extremely well in school. In addition, based on his observations of D.W. and H.B. together, Spitzer concluded that their relationship was "very close."
Next, H.B. testified in support of her adoption petition. According to H.B., then age fifty-seven, she had cared for D.W. continuously since he was thirteen months old. H.B. explained that although she initially allowed her younger sister R.W. to come over to her house and visit with D.W., that visitation arrangement did not work. According to H.B., R.W. repeatedly tried to take her son from H.B.'s home without permission, would come over unannounced and demand, "hollering and screaming," to see her son, broke a window in H.B.'s home with a vase on one occasion, and on another occasion stood in the lobby of H.B.'s apartment with her pants pulled down and "shook her naked behind at everybody." Despite these problems, H.B. testified that she would not object to supervised visitation "as long as [R.W.]'s not on drugs and straight." H.B. indicated that D.W. still refers to R.W. as his "mother" and that he loves her. She testified that R.W. would frequently give her son Christmas and birthday gifts.
After H.B. stepped down, R.W.'s twenty-four-year-old daughter I.R. took the stand in opposition to the adoption petition. I.R., who has two children of her own, testified that her mother raised her until she was nineteen years of age and, in her view, had been an excellent parent.[2] I.R. testified that her half-brother D.W. frequently talked about his mother and asked her whether he could call her. She explained that her mother's problems began in 1996 when she had a nervous breakdown following the deaths of I.R.'s father and older brother. I.R. believed that her mother was finally bouncing back from the tragedy and that her brother would adjust well in her care.
R.W. took the stand next and testified against the adoption of her son. She offered testimony to establish that she had the resources to care for him. Initially, she explained that she would soon begin a job at Walter Reed Army Medical Center that would pay close to thirty thousand dollars per year. She testified that she *1094 was living with her fiancé in an apartment, and although she was not the leaseholder, she was in a position to get her own apartment if the need arose. With respect to her educational level, R.W. testified that she had completed nearly two years of college. In addition, she related that she had participated in the Harbor Lights drug treatment program from April to August 2001 and went to meetings every day to cope with her addictions to drugs and alcohol. R.W. had also been seeing a therapist to prevent her from relapsing into drug and alcohol abuse. R.W. explained that her relationship with her half-sister H.B. had never been close, and that H.B. had made it difficult for her to reunite with her son. She denied her sister's accusations that she had broken her sister's window with a vase and removed her pants in the lobby of her sister's apartment building. Finally, she testified that she loved her son and believed that if the adoption went through, she would never see him again.
At the end of the first day of the hearing, the trial court indicated that it believed the case was a "close" one and that it was considering staying the adoption for three to six months and recommending that the neglect judge authorize R.W. to have protective supervision over her son during this period. In order to assess the feasibility of this option, the trial court indicated that it would first need to question R.W.'s fiancé to get a sense of whether he would bring stability into the child's life. In addition, the trial court requested that an assistant corporation counsel appear in court the following day to discuss the matter.
On day two of the show cause hearing, the trial court informed the assistant corporation counsel that, based on the evidence presented thus far, the court might lack the clear and convincing evidence necessary to waive R.W.'s consent to the adoption. The trial court acknowledged that the case posed a number of "appellate problems," including the fact that the CFSA social worker had lost a substantial number of records, the court's belief that R.W. had made "significant progress" both in terms of dealing with her substance abuse problem and obtaining a steady job, and the fact that visitation had been curtailed without an evidentiary hearing. Further, the trial court acknowledged that even the social worker had "in some instances, testified very favorably toward the mother." On the other hand, the trial court expressed a reluctance to simply dismiss the petition, given that the court was not convinced that R.W. could "function as a mother." With these considerations in mind, the trial court heard testimony from two final witnesses: the birth mother's fiancée, C.C., and H.B.'s daughter, I.B., both of whom testified favorably to R.W.

2. The Trial Court Issues a Stay
At the conclusion of testimony on May 29, 2002, counsel for R.W. moved to dismiss the adoption petition as not in the child's best interest and counsel for H.B. opposed the motion. The trial court took the two motions under advisement and informed the parties that it intended to stay the adoption case to give R.W. a chance to demonstrate her fitness as a mother. The trial court indicated that in addition to a written order staying the adoption, it would issue a formal recommendation to the neglect judge that R.W. have protective supervision over her son as long as three conditions were met: (1) the neglect judge would have to be satisfied with R.W.'s fiancé, (2) R.W. would have to "get her own place that's more than a basement apartment," and (3) R.W. would need to present a "current letter or report from her therapist." Notably, neither party objected to the trial court's proposed *1095 interim ruling in the matter. On June 21, 2002, the trial court issued a Memorandum and Order memorializing its decision to stay the adoption case.

3. The Status Hearing & Aftermath
At the status hearing on November 8, 2002, it became clear that R.W.'s efforts to reunify with her son had met with significant difficulty. R.W. was escorted into the courtroom by Deputy U.S. Marshals with her right arm in a sling and appearing very distressed and upset. R.W.'s attorney explained that she was being held in lieu of bail on pending criminal charges. Social worker Clayton Spitzer testified that he had not been able to contact R.W. since the show cause hearing, despite twenty attempts to do so by phone, mail, and in person. Spitzer explained that he could not figure out where R.W. had been living during that time. Although R.W. was supposed to be staying with her fiancé, C.C., when Spitzer tried to reach her there, C.C. would tell him that he hadn't seen R.W. for days and that she was living on U Street with her daughter. When Spitzer tried to contact R.W. at her daughter's home on U Street, the daughter would tell him that R.W. was staying with C.C. Furthermore, Spitzer had been unable to verify that R.W. had kept her job at Walter Reed Army Medical Center because she had not signed an authorization to release that information. Next, the court reviewed the results of R.W.'s drug testing for this period, noting that she had tested negative a couple of times in May, but failed to report for a couple of others in June and July. It appeared that the last time she reported for testing was July 11.
At that point, R.W. requested an additional six-month continuance "to get her life together" and stated that she remained opposed to the adoption. R.W. indicated that she wanted to address the court, so the trial court placed her under oath and allowed her to speak. According to the trial court,
[R.W.] talked rapidly and in a high strung manner manifesting impulsive behavior and erratic attitude toward the petitioner[s] and other relatives, claiming they were all against her. She acknowledged that she did not participate in drug testing as ordered by the neglect review judge and did not report to the social worker because everyone was conspiring against her. She acknowledged that she had some involvement in arguments with her boyfriend and suggested that she was jailed because of her conflict with him.
In addition, R.W.'s testimony suggested that her job at Walter Reed had also fallen through.
Based on R.W.'s statement in court, and "[the court's] observations of her demeanor, her eye expressions and tone of voice throughout her representations," the trial court found that R.W. had "los[t] the capacity to take care of herself, and thus beyond a reasonable doubt she is unable to properly care for and raise [D.W.] ...." The court also concluded,
[t]he fact that the child has been in the care of [H.B.] for now almost six (6) years is a strong factor justifying waiving the mother's consent. Even if her conduct was now without fault, it could be argued that she has taken far too long to prepare herself to take care of her son who is now almost seven (7) years old.
Accordingly, based on the evidence presented at both hearings, the trial court found that R.W. was unreasonably withholding her consent to the adoption. On January 10, 2003, the trial court issued its Final Decree of Adoption and R.W. timely appealed from the entry of that order.

*1096 ANALYSIS
Generally, the trial court may not grant an adoption petition unless both natural parents consent to the adoption. D.C.Code § 16-304(a) & (b) (2001). The trial court may, however, waive the consent requirement if the court finds, after a hearing, that consent is being "withheld contrary to the best interest of the child." D.C.Code § 16-304(e); see also In re P.S., 797 A.2d 1219, 1223 (D.C.2001). "The determination whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion." In re J.G., Jr., 831 A.2d 992, 999 (D.C.2003) (citing In re P.S., 797 A.2d at 1223-24). The trial court's findings in this regard must be supported by clear and convincing evidence. Id.
On appeal, R.W. argues first that the trial court abused its discretion by staying the adoption proceeding for six months, rather than dismissing it, after concluding at the show cause hearing that it might lack clear and convincing evidence to support a waiver of R.W.'s consent to the adoption. Initially, we note that this argument is not properly before us because R.W. failed to raise it at the trial court level.[3]See In re J.W., 806 A.2d 1232, 1235 (D.C.2002) (citing Williams v. Gerstenfeld, 514 A.2d 1172, 1177 (D.C. 1986)). Nonetheless, even had R.W. preserved this claim, we would not find the trial court's decision to stay the adoption proceeding to be an abuse of discretion. Appellant cites no authority, and we have found none, to suggest that the trial court was required to dismiss H.B.'s adoption petition when the court found that it might lack sufficient evidence to waive R.W.'s consent to the adoption. Although it is true that a trial court may not grant an adoption petition without first obtaining or waiving parental consent, see D.C.Code § 16-304, it does not follow that the trial court must deny an adoption petition when such consent or waiver are absent. Rather, our adoption statute specifies that "after considering the petition, the consents, and such evidence as the parties and any other properly interested person may present," D.C.Code § 16-309(b), the trial court may enter an adoption decree, "when it is satisfied, among other things, that `the adoption will be for the best interests of the prospective adoptee.'" In re D.I.S., 494 A.2d 1316, 1322 (D.C.1985) (emphasis added) (quoting D.C.Code § 16-309(b)(3) (1984 Supp.)). By enabling the court to rule "when it is satisfied" that adoption is the right course of action, the statute gives the trial court as much time as necessary to address the merits of the adoption petition. In this regard, it is important to remember that the show cause hearing was intended to resolve only one aspect of H.B.'s adoption petitionnamely, whether R.W. was wrongfully withholding her consent to the adoption. Although the trial court was uncertain whether the evidence presented at the show cause hearing would support a waiver of R.W.'s consent, this uncertainty did not obligate the court to dismiss H.B.'s adoption petition outright. It was well within the trial court's discretion to stay the proceedings until it had sufficient evidence to make an informed decision regarding whether to waive R.W.'s consent.
In this case, the trial court was concerned primarily about the social worker's failure to keep adequate records of his *1097 meetings with R.W. and her son. By entering the stay, the trial court was, in essence, giving the social worker a second chance both to review R.W.'s interactions with her child and to report this highly relevant information to the trial court after the stay. Moreover, while the testimony at the show cause hearing suggested to the trial court that R.W. was in the process of getting her life back in order, the court lacked evidence of R.W.'s present abilities to "function as a mother." R.W. had not cared for her son for nearly six years. The court was justifiably concerned that R.W. had tested positive for cocaine just two months prior to the show cause hearing. Thus, on the record as it stood after the show cause hearing, the trial court was not prepared to rule one way or the other on either the waiver issue or the adoption petition. We cannot fault the trial court for taking extra time to decide this case. As we have often said, when the future of a child is at stake, the trial court must strive to obtain "all of the information needed to effect a judicious disposition." In re L.W., 613 A.2d 350, 352-53 n. 6 (D.C.1992) (citing In re O.L., 584 A.2d 1230, 1233 (D.C.1990)).
We are similarly unpersuaded by R.W.'s argument that the trial court "exceeded [its] role as fact finder" and "impermissibly intervened in the trial." To the extent that R.W. argues that the stay, in and of itself, was impermissible judicial intervention, we note that it was well within the trial court's power to enter the stay. See Bradley v. Triplex Shoe Co., 66 A.2d 208, 209 (D.C.1949) (citing Landis v. North Am. Co., 299 U.S. 248, 254, 257, 57 S.Ct. 163, 81 L.Ed. 153 (1936)) ("`the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants'"). R.W. has suggested that the trial court acted as "case manager" by "determin[ing] what information should be presented to the neglect judge, what type of housing appellant should obtain" and "request[ing] additional documentary evidence."[4] Our review of the record, however, indicates that the trial court ordered none of these things. Although the trial court wanted to give R.W. the chance to reunite with her son during the stay, the trial court recognized that protective supervision was within the purview of the neglect court. Therefore, the trial court offered to recommend that the neglect court allow for protective supervision if R.W. found a new apartment, obtained a letter from her therapist, and if the neglect court was satisfied with R.W.'s fiancé. The trial court never ordered R.W. to comply with any of these conditions; in fact, the trial court's June 21, 2002 Memorandum & Order makes no mention of them. Regardless, as this court observed in In re D.M., 771 A.2d 360, 369 (D.C.2001), child neglect matters "implicate[] the judge's responsibility, as parens patriae, to act on behalf of the child, and somewhat more active judicial participation in the development of the facts may arguably be permissible."[5]
*1098 Having concluded that the trial court did not act improperly in ordering the stay,[6] we turn now to R.W.'s argument that the trial court abused its discretion in granting the adoption over her objection. An adoption following the waiver of a birth parent's consent effectively terminates that parent's interest in the care, custody and control of her child. See In re L.W., 613 A.2d at 356. Thus, in order to determine whether the trial court abused its discretion in waiving R.W.'s consent to the adoption, we apply the provisions of the District's termination of parental rights (TPR) statute, D.C.Code § 16-2353(b) (2001). See In re J.G., Jr., 831 A.2d at 999 (citing In re L.W., 613 A.2d at 356). Section 16-2353(b) directs the trial court to consider the following factors in determining whether it is in the child's best interests to terminate the parent-child relationship:[7]
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home ...;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child ...;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;...
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided .... Evidence of continued drug-activity shall be given great weight.
D.C.Code § 16-2353(b).
In the instant case, the trial court did not make explicit findings with respect to the foregoing TPR factors. Nevertheless, we are satisfied that the trial court's findings addressed the relevant criteria and were supported by clear and convincing evidence. At the time of the status hearing, on November 8, 2002, R.W. was incarcerated at the D.C. Jail on pending criminal charges. In the six months following the show cause hearing, R.W. had lost her job at Walter Reed Medical Center, failed to participate in drug testing as ordered by the neglect judge, and avoided her social worker because "everyone was conspiring against her." It was no longer clear, at that point, that R.W. even had a home. Observing R.W.'s demeanor, coupled with her bizarre and disjointed testimony on the stand, the trial court concluded that she had lost the capacity to take care of herself, let alone her child, since her prior court appearance. The trial court recognized that D.W. had been in his aunt's care for nearly six years, and that his aunt has been his "psychological mother in fact" during this time. R.W. has not challenged these findings on appeal. In fact, at oral argument, R.W.'s attorney *1099 conceded that at the November 8 status hearing, R.W.'s situation was exactly as the trial court described.
Having outlined the trial court's findings, which are not in dispute, we turn now to the statutory TPR factors.[8] With respect to D.W.'s "need for continuity of care and caretakers and for timely integration into a stable and permanent home," D.C.Code § 16-2353(b)(1), we note that D.W. had spent almost his entire life with his aunt in a loving and stable home. His birth mother, by contrast, had for six years been unable to make the life changes necessary to reunify with her son. Without a job, R.W. lacked the financial means to support D.W. Considering that R.W. was also incarcerated at the time of the hearing, her prospects for reunification in the near future were speculative, at best. Given our "strong public policy ... disfavoring the protracted retention of children in foster care," see In re J.G., Jr., 831 A.2d at 1001, the trial court rightfully concluded that adoption was preferable to the "legal limbo" where D.W. would have remained had the adoption not been granted.
The second factor, involving "the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child," D.C.Code § 16-2353(b)(2), also supports the waiver of R.W.'s consent. Noting R.W.'s "extensive history" of substance abuse and mental illness, the trial court observed that as she testified, R.W. "talked rapidly and in a high strung manner manifesting impulsive behavior and erratic attitude toward the petitioners and other relatives." Relying upon "its observations of her demeanor, her eye expressions and tone of voice throughout her representations ... this Court concluded that she has even los[t] the capacity to take care of herself, and thus beyond a reasonable doubt she is unable to properly care for and raise" her son.
The third factor, "the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent," D.C.Code § 16-2353(b)(3), is more neutral. By all accounts, R.W. had a loving relationship with her son, despite the fact that they saw each other relatively infrequently. By the same token, the petitioner H.B. also had a loving relationship with the nephew she sought to adopt. Although no evidence was presented with respect to the fourth factor, "the child's opinion of his or her own best interests in the matter," D.C.Code § 16-2353(b)(4), the absence of evidence on this factor is not dispositive. See In re A.R., supra note 7, 679 A.2d at 478-79.
Finally, the fifth factor, "evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided," D.C.Code § 16-2353(b)(5), weighs strongly in favor of adoption.[9] R.W. admitted at the show cause hearing that she had problems with cocaine and alcohol abuse and was seeing a therapist to deal with those problems. Although she had completed the Harbor Lights drug treatment program, R.W. later tested positive for cocaine *1100 in March of 2002, and thereafter failed to comply with court-ordered drug testing. As this court has recognized, even when an addicted parent has not used drugs for more than a year, "[that] time frame is negligible when one considers the high rate of recidivism ... and the kind of risk that is involved in putting a child ... in the environment that drug addiction breeds." In re L.L., 653 A.2d 873, 885 n. 25 (D.C.1995) (quoting In the Interest of Ashley K., 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905, 922 (1st Dist.1991)). Given R.W.'s documented history of drug abuse, which included a positive test result eight months prior to the status hearing, and R.W.'s recent failure to comply with court-ordered drug testing, there remained a substantial risk that R.W. might relapse.
On balance, the foregoing factors weighed heavily in favor of terminating R.W.'s parental rights. The court was satisfied "beyond a reasonable doubt" that the adoption was in D.W.'s best interests.[10] Under the circumstances, we find no abuse of discretion.
Affirmed.
NOTES
[1] While this appeal was pending, the title of the District's chief attorney was changed. The Corporation Counsel is now known as the Attorney General for the District of Columbia. See Mayor's Order No. 2004-92, 51 D.C. Register 6052 (May 26, 2004).
[2] On cross-examination, I.R. admitted that she had, at one point, obtained a document prohibiting her mother from entering her property because of disorderly conduct. I.R. would not, however, concede that this order was a "stay away order."
[3] Although R.W. states in her appellate brief that she "strenuously" objected to the stay, the record flatly contradicts her claim. In fact, testimony from the show cause hearing indicates that R.W. was actually in favor of the stay and was actively working with the trial court to ensure that the proposed reunification went according to plan.
[4] During oral argument, R.W. clarified that she was not claiming that the trial court had improperly shifted the burden of proof from H.B., requiring her fitness as a mother. Rather, her argument was simply that the trial court had exceeded the scope of his authority as an impartial fact finder.
[5] R.W.'s reliance on In re T.S., 829 A.2d 937 (D.C.2003), is misplaced. In that case, we admonished the trial court for sua sponte conducting its own investigation into alleged facts by sending letters to material witnesses and relying on responses to those letters in ruling on a motion before it. Id. at 938, 941. By contrast, in the instant case, the trial court merely issued a stay and directed the parties to address the issue of reunification with the neglect judge who had authority to place conditions on R.W.'s visitation with her son. We see no evidence of judicial overreaching here.
[6] We note that even if the trial court did err in granting the stay, R.W. suffered no prejudice from the court's action. R.W. conceded at oral argument that even if the trial court dismissed the petition after the show cause hearing, H.B. could have filed a new adoption petition with the court in six months.
[7] The trial court need only consider the statutory factors that bear directly on the issues involved in the case before it. See, e.g., In re J.G., Jr., 831 A.2d at 999 n. 15; In re A.R. 679 A.2d 470, 473 (D.C.1996). Therefore, we have quoted only those sections of the TPR statute that are relevant to the instant case.
[8] None of these factors alone is dispositive. In re A.R., supra note 7, 679 A.2d at 478-79. "In some cases, the evidence with respect to one factor may point in one direction, while the evidence as to a second factor may suggest a contrary disposition. The judge's responsibility is to consider the evidence in the record with respect to all of the statutory criteria." Id. The trial court may enter a TPR even where the moving party has prevailed with respect to some but not all of the statutory factors. Id. at 478.
[9] Indeed, the statute provides that "[e]vidence of continued drug-activity shall be given great weight." D.C.Code § 16-2353(b)(5).
[10] In her brief and during oral argument, R.W. suggested (based on H.B.'s testimony at the show cause hearing) that H.B. was under the "misconception" that adoption was the only permanency option available and that H.B. would have been satisfied with legal guardianship had she known about this option. This claim is speculative, at best. If H.B. did not truly want to adopt D.W., she could have dropped her adoption petition at any time during the six-month stay period. In fact, H.B. proceeded with the adoption, which indicates that she did want to adopt her nephew.