**Diane J. HENDEL, Appellant,**

**v.**

**WORLD PLAN EXECUTIVE COUNCIL and Maharishi International University, Appellees.**

**No. 96–CV–105.**

District of Columbia Court of Appeals.

Argued March 4, 1997.

Decided Dec. 30, 1997.

David J. Bardin, with whom Idris M. Diaz, Washington, DC, and Gerald F. Ragland, Jr., Alexandria, VA, were on the brief, for appellant.

Christine Liverzani Prame, with whom Carter G. Phillips, Mark D. Hopson, Washington, DC, and Dwight W. James, Des Moines, IA, were on the brief, for appellees.

Before SCHWELB, FARRELL and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

Transcendental meditation (TM) is described by its proponents as "an effortless meditation technique designed to enable the meditator to achieve a deeply restful, yet alert, mental state and to provide a means for the mind to experience finer and more quiet levels of the thought process." The technique was developed by Maharishi Mahesh Yogi and is said to be based on the ancient Vedic tradition, which has its roots in India. For many years, appellees World Plan Executive Council (WPEC) and Maharishi International University (MIU) have offered courses in TM and have organized conferences and other programs and activities. As this case and others illustrate, appellees' techniques and entrepreneurial undertakings have not gone without controversy.

On September 1, 1989, Diane Hendel, who had been involved in the TM movement for many years, brought this action against WPEC and MIU, alleging fraud, intentional and negligent infliction of emotional distress, negligent infliction of physical injury, and unfair trade practices. Following extensive discovery in related litigation, the defendants filed a motion for summary judgment in which they contended that all of Ms. Hendel's claims were barred by the three-year statute of limitations. *See* D.C.Code § 12–301(8) (1995).[1] A hearing on the motion was held on July 31, 1992. On January 3, 1996, the trial judge issued a comprehensive opinion in which he held that the action was time-barred.[2]

On appeal, Ms. Hendel contends that her complaint was timely under the "discovery rule," and that, at the very least, there were genuine issues of material fact precluding the entry of summary judgment on the limitations issue. We affirm.

## I.

## FACTUAL BACKGROUND

Ms. Hendel was initially introduced to TM in 1971, when she was a fourteen-year-old junior high school student. As a teenager, she took several TM courses at resident TM centers in Kansas City, Missouri. In or about 1975, Ms. Hendel dropped out of high school, moved out of her parents' home, and became intensively involved in TM-related activities.

In 1976, Maharishi introduced the TM–Sidhi program, which included many hours a day of sustained meditation, as well as Yogic Flying (*i.e.*, strenuous hopping in a cross-legged lotus position). Ms. Hendel participated in this program and claims to have spent four to eight hours per day in meditation for a period of ten years. She travelled to various places in the United States, India and other countries and participated in numerous TM courses, meetings and programs. In 1980 and 1981, she attended TM teacher training in Switzerland, and she thereafter served as a teacher of TM and as a "Governor of the Age of Enlightenment." Ms. Hen-

1. The defendants had filed an earlier motion for summary judgment in which they attacked most of Ms. Hendel's claims on substantive grounds.

2. The judge also ruled in the defendants' favor on several other grounds. In this opinion, we address only the limitations issue, which we deem dispositive.

del discontinued her TM activities in 1988, and she brought this action in the following year.

Ms. Hendel claims that the defendants induced her participation in their programs with numerous misrepresentations. She testified that when she first became involved with the TM movement, the defendants promised that within two or three years she would attain "the state of enlightenment according to Maharishi." She described that state as "[o]mniscience, harmony in all actions, perfect knowledge." She alleged in her complaint that, in 1976,

> [d]efendants falsely represented to plaintiff that the knowledge given in [the TM–Sidhi] course would enable her to rapidly develop certain desirable characteristics such as friendliness, happiness, and compassion and attain certain extraordinary powers such as clairvoyance, ability to levitate, ability to fly, invisibility, and superhuman strength. Defendants falsely represented that plaintiff would ultimately become a "Master of Creation" with the ability to manipulate the physical world and the laws of nature.

In her answers to interrogatories, Ms. Hendel further described some of the defendants' more exotic alleged representations:

> Defendants specifically represented that individuals would slowly rise in the air, move forward and gently land, thereby exhibiting control over the laws of nature.
>
> Defendant Mahesh Yogi instructed TM teachers to be bold when making claims for the TM–Sidhi program. In some cases, practitioners were told that people were flying over Lake Lucern. Stories were circulated about people walking through walls, hovering, and becoming invisible.

The defendant's alleged promises of wonderful rewards for good conduct were accompanied by warnings of baleful consequences if Ms. Hendel and others did not do what they were supposed to do. Ms. Hendel testified, for example, that students were told during teacher training "that we needed to go to bed by 10 o'clock or we would be responsible for World War III."

Ms. Hendel synopsized defendants' alleged deceptions as follows:

> Defendants claim the practice of TM involves only 20 minutes twice a day, this is not true. Defendants claim the practice of TM requires no change in lifestyle or beliefs, this is not true. Defendants claim the practice of TM has only positive and no negative effects, this is not true. Defendants claim the practice of TM is beneficial for everyone, this is not true. Defendants claim the benefits of TM are scientifically proven, when, in fact, the practice of TM was experimental. Defendants further claim that TM will improve memory, reduce stress and anxiety, improve health and reverse aging, this is not true.

All of these misrepresentations, according to Ms. Hendel, were made by the defendants with knowledge of their falsity. Ms. Hendel claims that in reliance on the defendants' false promises, she devoted much of her life to TM programs and activities. She asserts that, as a result, she sustained "severe physical and mental injuries," and that she lost "substantial amounts of money and time which could have been devoted to productive activity." [3]

The defendants do not concede that they made the representations alleged by Ms. Hendel or that any of the representations

3. During her deposition, Ms. Hendel described as follows the harm that the defendants had allegedly caused her:

> By the practice of TM, I have problems with disassociation; I have problems with distortions and perception; I have memory problems; I have chronic pain in my knees and my back, especially in cold weather. I have difficulty concentrating. I have difficulty comprehending. I have problems in handling stress. I have a tendency to get sporadic cases of amnesia under intense stress. I have difficulties telling the difference between what is real and what is not real. I have problems distinguishing nighttime from daytime at times. I have problems with insomnia. I have severe nightmares. I have no advanced education, I didn't complete my B.A., I have not had time to practice a career, according to those of my peer group, I have earned very little money, I am not—I have difficulty getting jobs, I have an untraceable resume, and you can read my complaint and interrogatories.

that they did make were false. They contend, however, that if Ms. Hendel's allegations are taken as true, they reveal that she knew or should have known, prior to September 1, 1986, of defendants' alleged wrongdoing and of the harm the defendants allegedly caused her. Because Ms. Hendel did not bring the suit until September 1, 1989, and because the parties agree that the three-year statute of limitations applies to all of Ms. Hendel's claims, the defendants maintain that the complaint is time-barred in its entirety. The trial judge agreed, concluding that "[p]laintiff was on notice of facts sufficient to bring her fraud claim long before September 1, 1986." [4] This appeal followed.

## II.

## LEGAL DISCUSSION

A. *Summary judgment standard.*

To prevail on a motion for summary judgment, the defendants must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Super Ct. Civ. R. 56(c); *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc). The evidence must be viewed in the light most favorable to Ms. Hendel, and she is entitled to "all favorable inferences which may reasonably be drawn from the evidentiary materials." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C.1991).

"On appeal from an award of summary judgment, this court conducts an independent review of the record, but the substantive standard is the same as that utilized by the trial court." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C.1994) (citation omitted). The test for deciding a motion for summary judgment is essentially the same as the standard for a directed verdict. *Beard, supra*, 587 A.2d at 199. In considering the motion, the judge must determine "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the summary judgment record

> demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper.

*Nader v. de Toledano*, 408 A.2d 31, 42 (D.C. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980) (quoting *Time, Inc. v. McLaney*, 406 F.2d 565, 572 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969)).

B. *The discovery rule.*

The parties agree that Ms. Hendel was required to bring her action within three years "from the time the right to maintain the action accrues." D.C.Code § 12–301(8) (1995). If, as a matter of law, Ms. Hendel's claim accrued prior to September 1, 1986, then the complaint was time-barred. If, on the other hand, there is a genuine issue of material fact as to whether Ms. Hendel's right of action accrued before or after September 1, 1986, then the defendants were not entitled to summary judgment based on the expiration of the statute of limitations.

Where the fact of an injury can be readily determined, a claim accrues at the time that the plaintiff suffers the alleged injury. *Colbert, supra*, 641 A.2d at 473. Ms. Hendel argues, however, that the present case is governed by the "discovery" rule, and that the statute of limitations did not begin to run until December 1988, when she severed her association with TM. We have applied the discovery rule to determine when the statute of limitations commences to run in those cases in which "the relationship between the fact of injury and the alleged tortious conduct is obscure." *Bussineau v. President & Dirs. of Georgetown College*, 518 A.2d 423, 425 (D.C.1986). We held in *Bussineau* that a plaintiff's right of action does not accrue until the plaintiff "knows" or "by the

4. The judge held that the defendants' conduct that formed the basis for the allegations of fraud also formed the basis for the plaintiff's other claims, and that Ms. Hendel was therefore on notice of those claims more than three years before she filed suit.

exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Id.* at 435.

"The discovery rule was developed to redress situations in which the fact of injury was not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred." *Farris v. Compton,* 652 A.2d 49, 55 (D.C. 1994) (citation and internal quotation marks omitted). "To say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law." *Berry v. Branner,* 245 Or. 307, 421 P.2d 996, 998 (1966) (citation omitted).

The discovery rule does not, however, give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm. Indeed, a right of action may accrue before the plaintiff becomes aware of all of the relevant facts. "It is not necessary that all or even the greater part of the damages ... occur before the [right] of action arises." *Knight v. Furlow,* 553 A.2d 1232, 1235 (D.C.1989) (citation omitted). Any "appreciable and actual harm flowing from the [defendant's] conduct" is sufficient. *Id.* "[T]he law of limitations requires only that [the plaintiff] have *inquiry notice* of the existence of a cause of action...." *Colbert, supra,* 641 A.2d at 473 (emphasis added) (quoting *Baker v. A.H. Robins Co.,* 613 F.Supp. 994, 996 (D.D.C.1985)). We must therefore determine whether, as a matter of law, Ms. Hendel was placed on inquiry notice prior to September 1, 1986, of the possibility that she had suffered appreciable harm as a result of the wrongful conduct of the defendants.

C. *Ms. Hendel's knowledge, actual and constructive.*

In our view, the record, considered in the light most favorable to Ms. Hendel, demonstrates beyond peradventure that prior to September 1, 1986, Ms. Hendel was placed on inquiry notice as to each element of her right of action. We are satisfied that no impartial juror could reasonably find that she was not.

We begin with the fact that, according to Ms. Hendel, the defendants made representations which any reasonable person would recognize as being contrary to common human experience and, indeed, to the laws of physics. If, as Ms. Hendel alleges, she was told that meditators would slowly rise in the air, and that some of them were "flying over Lake Lucern" or "walking through walls, hovering, and becoming invisible," and that her failure to go to bed on time could bring about World War III, then a reasonable person[5] would surely have noticed, at some time prior to September 1, 1986, that some of these representations might not be true.[6]

At the outset of her involvement with the defendants, Ms. Hendel claims to have been promised that within two or three years, she would gain "omniscience, harmony in all actions, [and] perfect knowledge." She testified, however, that she was on notice by 1980 that this promise had not materialized:

Q. By the time you went to teacher training, did you know anyone who had practiced TM for two to three years who had been able to gain those things?

A. I don't know.

Q. But you were pretty sure that you hadn't, weren't you?

A. Yes.

According to Ms. Hendel, the defendants also represented to her at an early date that TM required meditation only for twenty minutes twice a day, and that she would not have

5. For the reasons stated *infra* in Part II D of this opinion, Ms. Hendel's actual or constructive knowledge of the relevant facts must be assessed under an objective "reasonable person" standard.

6. As Ms. Hendel stated in her deposition, "[i]t is a lie that people can fly." Ms. Hendel also testified that in the 1970's, when she took the TM-Sidhi program in order to learn to fly, her father objected "because it sounded crazy." Ms. Hendel was an adult at this time, and her father's warning was one which a reasonable person would surely have heeded.

to change her lifestyle. She claims, however, that she subsequently meditated for four to eight hours a day *for ten years*, and that her life was dominated by TM activities and dramatically altered. A reasonable person was or should have been aware, prior to 1986, that the defendants' alleged promises regarding the nature of TM had not been kept.

After attending teacher training in Switzerland in 1980 and 1981, Ms. Hendel became a TM instructor. She stated in her answers to interrogatories that

> [a]ll TM teachers are told by Mahesh Yogi and the TM movement how to handle cases of severe unstressing.[7] While every teacher is aware of the effects and the risks of new participants experiencing severe unstressing, they are specifically advised not to mention the danger or risks in their introductory or preparatory lectures.

Indeed, Ms. Hendel testified in her deposition that although she was aware in the late 1970's of reports that people were having adverse consequences from the TM–Sidhi program, she withheld this information from her students:

> Q. When you became a teacher of TM, did you tell people who you were teaching to do so that to do so might not be helpful to them?
>
> A. Not in the beginning, no.
>
> Q. Did you tell them that the practice might be harmful to them?
>
> A. Not in the beginning, no.

Ms. Hendel thus acknowledged not only that she was aware of the alleged deception but that, at least for some period of time, she engaged in it herself.

Ms. Hendel also testified during her deposition that, at about the time that she participated in the TM–Sidhi program, she discovered that she was having problems with her memory, that she was sometimes unable to estimate distances,[8] that she had developed difficulty in handling stress, and that she was suffering from insomnia. As to the last of these symptoms, Ms. Hendel testified as follows:

> Q. Who has told you that your insomnia was caused by your practice of TM?
>
> A. The doctors that I listed earlier.
>
> Q. They told you it was because of TM?
>
> A. Yes.

Ms. Hendel's reference to "the doctors that I listed earlier" relates to her response to the defendants' Interrogatory 19. That interrogatory reads as follows:

> Describe all examinations, treatments, evaluations, or other care or attention you have received from physicians, surgeons, osteopaths, chiropractors, clinics, hospitals, psychiatrists, psychologists or other health care professional for any injury, illness or disability stated in Interrogatory No. 18 and identify:
>
> a. Each health care provider,
>
> b. The date or dates of examination, treatment or evaluation,
>
> c. The nature, purpose and extent of each such examination, treatment or evaluation
>
> d. The prognosis made by said health care professional and
>
> e. *Any health care professional described above in subpart (a) who concluded that any of the alleged injuries, illnesses or disabilities set forth in the answer to Interrogatory No. 18 were the result of any conduct or statements by defendants.*

(Emphasis added.) In her answer to part a. of this interrogatory, Ms. Hendel listed a total of forty-two health care providers. In response to part b., she identified twenty-five of the providers as having treated her prior to 1986. As to seventeen of these twenty-five, Ms. Hendel responded "yes" to part e. of this interrogatory.

There is nothing in Ms. Hendel's answers to suggest that she consulted with any of

7. We have found no definition in the record of "unstressing," although the term appears at one time to have been a common one in TM parlance. It evidently refers to intensified meditation and other activities designed to achieve the release of stress; these activities sometimes allegedly led to hallucinations, headaches, disorientation and other adverse symptoms. In 1982, according to Ms. Hendel, Mahesh Yogi banned the use of the word "unstressing."

8. Ms. Hendel stated that "I cannot frequently tell whether something is a foot away or 10 feet away," and that she has had this problem "since I learned the TM–Sidhi program."

these seventeen providers at any time other than in the year listed in response to part b. Given her unequivocal affirmative answer to part e., the only reasonable construction of Ms. Hendel's response to Interrogatory 19 is that, prior to 1986, the seventeen listed health care professionals linked her condition to the activities of the defendants.[9]

Ms. Hendel testified that during the "mid 80's," "probably" prior to 1985, she learned "indirectly" from Bevan Morris[10] that students at MIU had been hospitalized for "unstressing." She stated that some of these students were suffering from "[d]isassociation, anxiety, depression, suicidal obsessions, hallucinations, memory lapses, distortions in perception, [and] nightmares." Some of these individuals "expressed those things to Bevan Morris" in Ms. Hendel's presence.[11] According to Ms. Hendel, Morris' teaching was not helpful because "[h]e knows of people who have had problems and he doesn't acknowledge them."

The incidents that we have enumerated are by no means exclusive. The defendants have listed in their brief numerous other portions of Ms. Hendel's deposition testimony and answers to interrogatories which reflect that, long before 1986, she knew or should have known of the defendants' allegedly broken promises and wrongful conduct, of the harm that she claims to have suffered, and of the causal relationship between that harm and the defendants' activities. The trial judge concluded that the medical and health care professionals consulted by Ms. Hendel "imparted sufficient facts and advice to [her] to put a reasonable person on notice that her alleged injuries, psychological and physical, were causally related to her practice of Transcendental Meditation and her participation in the TM–Sidhis program." We agree.

D. *Mental impairment.*

Ms. Hendel claims, however, that her failure to recognize the harm that was being

9. In an affidavit filed in opposition to the motion for summary judgment, Ms. Hendel attempted to explain her response to Interrogatory 19:

> 5. Defendants have alleged that from 1980 to 1983, 17 doctors had told me that my alleged injuries were attributable to TM. However, these doctors, whom I list in Answer to Interrogatories # 11, were either (1) TM "doctors," such as Dr. Tri Guna, who prescribed powders for dysentery and "unstressing," etc., (2) acupuncturists or chiropractors who treated me for ongoing dysentery problems, or knee and back problems, from "Yogic flying," or (3) medical professionals whom I consulted about ongoing dysentery problems, such as Kavin Cahill, M.D., a parasitologist.
>
> 6. Since these symptoms which I now realize are problems, such as memory loss, insomnia, nightmares, disorientation, etc. [] were characterized as positive signs of stress release by the defendants and myself prior to my leaving the TM movement, I did not seek treatment for these symptoms outside of the TM organization, but rather I had my meditation "checked" or consulted a TM administrator who inevitably recommended an advanced course or technique, and/or more "checking."

Assuming, without deciding, that this affidavit, composed after Ms. Hendel's answers to interrogatories, should be accorded significant weight in the court's calculus, *but cf. Hancock v. Bureau of Nat'l Affairs, Inc.*, 645 A.2d 588, 590–91 (D.C.1994), the contents of the affidavit demonstrate the existence of inquiry notice. According to Ms. Hendel, she consulted acupuncturists or chiropractors who treated her, *inter alia*, for "knee and back problems" incurred as a result of her "Yogic flying." Obviously, according to Ms. Hendel's answer to Interrogatory 19, the acupuncturists and chiropractors attributed the problems with her knee and back to the defendants' practices. A reasonable person was chargeable with knowledge that the defendants' insistence that she engage in activities that hurt her knees and back may have been wrongful. In any event, Ms. Hendel confirmed in her deposition testimony that the health care providers identified in her answer to interrogatories attributed her insomnia to the defendants' activities. See pp. 11–12, *supra*.

Apparently recognizing that Ms. Hendel's responses to discovery undercut her position on the limitations issue, defendants complain that "[t]he trial court failed to give [Ms.] Hendel the benefit of the reasonable inference that her confusion persisted for some time, and might have clouded her understanding when she answered interrogatories or deposition questions in 1990." Ms. Hendel was represented by counsel at the time that she provided these answers. She has cited no authority for the proposition that she can escape the consequences of her sworn testimony on the basis of her claim, made years after the fact, that she may have been confused. Her contention that the judge had the obligation to protect her from her own answers is unconvincing to say the least.

10. Morris is not identified in the record, but appears to have been an instructor at one of the TM courses.

11. Ms. Hendel also attributed some of her information about Morris to "rumors."

done to her resulted from her impaired mental condition, which was itself allegedly caused by the wrongful conduct of the defendants. She initially alleged in paragraph 23 of her complaint that "[t]hought reform, caused by defendants' psychological training, caused plaintiff to fail to detect her mental injury." In paragraphs 31 and 32, Ms. Hendel elaborated on this theme and asserted that because the defendants created "emotional and psychological dependency" on her part, and because of the "mental confusion, disorientation, and inability to think clearly caused by the practice of TM," she was "unable to realize that the negative emotional, psychological, and physical effects she was experiencing were the result of the practice of TM and the Sidhis."

Ms. Hendel invokes the principle, "[d]eeply rooted in our jurisprudence," that "no man may take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959). Acknowledging that an objective, reasonable person test applies to discovery rule issues, Ms. Hendel insists that her allegations of undue influence are consistent with that standard, because

> it was not unique aspects of [Ms.] Hendel's personality or [Ms.] Hendel's personal characteristics that disabled her from discovering the harm being done to her mental health. Anybody in [Ms.] Hendel's position would have been lulled and blinded, as [Ms.] Hendel stands ready to convince the jurymen and jurywomen:—that *they too* would have been deceived in similar circumstances.
>
> Far from being [Ms.] Hendel's peculiarities, the pertinent characteristics are World Plan/Maharishi's totalitarian methods. If somebody blindfolds you, the fact that you cannot see reflects nothing peculiar about you. Your blindness stems from the acts of the blindfolder.

(Emphasis in original.) Ms. Hendel's argument has been effectively presented, but we do not believe that it can be sustained on this record.

The "thought reform" or "brainwashing" theory articulated in paragraph 23 of the complaint has encountered difficulties in the courts. *See, e.g., Kropinski v. World Plan Executive Council—US,* 272 U.S.App. D.C. 17, 853 F.2d 948 (1988) (reversing judgment for plaintiff because, *inter alia,* the testimony of Dr. Margaret Singer [12] explaining that theory was erroneously admitted); *Greene v. Maharishi Mahesh Yogi,* Nos. 87–0015, 87–0016 (D.D.C. Mar. 13, 1991) (Gasch, J.) (granting motion *in limine* to exclude Dr. Singer's proposed testimony because it lacked general acceptance in the scientific community).[13] Apparently on account of these difficulties, counsel for Ms. Hendel represented as follows in his pretrial statement, filed on March 25, 1992:

> Without conceding that the TM defendants did not subject Diane Hendel to a program of "thought reform," plaintiff will not pursue that allegation at the trial of this case. Moreover, plaintiff will not elicit testimony from any witness on the subject of "thought reform." Plaintiff reserves the right, however, to elicit any testimony which goes to the issue of plaintiff's psychological state, including, but not limited to, mental impairment which may have prevented her from realizing the nature and source of her injuries.

This change of direction significantly affects the issue before us. Counsel obviously made a deliberate decision to preserve as an issue Ms. Hendel's alleged psychological condition. At the same time, apparently for tactical reasons, counsel took out of the case any claim that as a result of wrongful conduct on the part of the defendants, Ms. Hendel was rendered totally unable to function. Indeed, counsel's statement seems to shift Ms. Hendel's focus away from the defen-

12. Ms. Hendel also relies on an affidavit by Dr. Singer in support of her "undue influence" theory.

13. Judge Gasch pointed out in *Greene* that, according to a brief filed by the American Psychological Association in another case, "Dr. Singer's theories have no empirical support, are based on a faulty methodology, and are not accepted in the relevant professional literature." *See also United States v. Fishman,* 743 F.Supp. 713, 718–19 (N.D.Cal.1990) (noting "significant rejection" by the scientific community of Dr. Singer's views and excluding her testimony).

dants' conduct and instead upon Ms. Hendel's mental state.[14]

Ms. Hendel's allegedly impaired judgment does not excuse her failure to file her action in timely fashion. District of Columbia law provides:

> [W]hen a person entitled to maintain an action is, at the time the right of action accrues:
>
> (1) under 18 years of age; or
>
> (2) noncompos mentis; or
>
> (3) imprisoned—
>
> he or his proper representative may bring [the] action within the time limited after the disability is removed.

D.C.Code § 12–302(a) (1995). The phrase "*non compos mentis* ... generally refers to someone incapable of handling his own affairs or unable to function [in] society." *Speiser v. United States Dep't of Health & Human Servs.*, 670 F.Supp. 380, 384 (D.D.C. 1986) (citations omitted), *aff'd*, 260 U.S.App. D.C. 229, 818 F.2d 95 (1987). "*[I]mpaired judgment alone* is not enough to toll the statute of limitations." *Id.* (emphasis in original) (citing *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389, 393 (1980)). Counsel for Ms. Hendel explicitly stated in the opposition to defendants' motion for summary judgment that she was not advancing a "*non compos mentis* tolling theory." The proposed analogy between this case and one in which the defendant blindfolds the plaintiff thus falters; a blindfolded plaintiff is able to see nothing, whereas there is no claim, nor could there be, that Ms. Hendel was deprived of her entire capacity to comprehend.

Although Ms. Hendel has abandoned her "thought reform" allegation, and even though she makes no claim that she was "*non compos mentis*," she nevertheless urges us to hold that the statute of limitations should be tolled because the defendants are alleged to have exercised "undue influence" upon the plaintiff and the plaintiff's judgment is claimed to have been impaired thereby. On the record before us, we decline to follow Ms. Hendel's proffered approach. In *McCarthy v. Volkswagen of America, Inc.*, 55 N.Y.2d 543, 450 N.Y.S.2d 457, 435 N.E.2d 1072 (1982), the plaintiff, who was suffering from post-traumatic neurosis, argued that her affliction was a mental illness and constituted insanity for the purpose of tolling the statute of limitations. In rejecting this contention, the court stated:

> As time passes, the defense of an action may become more difficult. Statutes of Limitation therefore have aptly been described as statutes of repose. Accordingly, the tolling provisions should not readily be given an expansive interpretation tending to undermine the basic purposes behind the Statutes of Limitation.

*Id.* at 459, 435 N.E.2d at 1074.

The court's comments in *McCarthy* are instructive. Ms. Hendel's case is based in substantial part on events and conversations that took place a quarter of a century ago. She is available to tell her side of the story, as best she remembers it, but it may be well-nigh impossible for the defendants to locate the persons whom Ms. Hendel claims to have encountered. Even if some of the potential defense witnesses are available, their recollections of the events at issue are likely to be imperfect to say the least. Relevant documents may no longer exist. The Supreme Court has emphasized that limitations statutes are designed to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by

14. The quoted paragraph in the plaintiff's pretrial statement is a part of the summary judgment record, and we must view it in the light most favorable to Ms. Hendel. It was, however, prepared by Ms. Hendel's counsel, and the parties and court have a right to rely upon it. If counsel's intention was to keep in the case allegations of forms of "undue influence" other than "thought reform," it was his obligation to say so.

Subsequently, counsel for plaintiff filed an affidavit of Dr. Singer in opposition to the defendants' motion for summary judgment. In that affidavit, Dr. Singer made no express allusion to "thought reform," but she asserted, *inter alia*, that "[a] cycle of philosophical indoctrination and social pressure" made Ms. Hendel and other participants in TM "dependent on the organization economically, socially and emotionally...." These pressures, according to Dr. Singer, "combined to socially and psychologically immobilize them." Dr. Singer did not claim, however, that any conduct on the part of the defendants rendered Ms. Hendel *non compos mentis*.

death or the disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979); *Farris, supra,* 652 A.2d at 57–58. Ms. Hendel invokes considerations of fairness, but it would hardly be fair to the defendants to require them to prepare a defense to allegations concerning events some of which are said to have occurred in the early 1970's.

This case is not like *Farris,* on which Ms. Hendel relies. In *Farris,* the plaintiffs claimed that as a result of the defendant's sexual abuse of them when they were children, they had totally repressed their memories of their experiences, so that they had been precluded from filing suit until their recollections were restored. The question before us was whether a complaint so alleging stated a claim upon which relief may be granted. We held that the complaint should not have been dismissed on the pleadings alone, but that the defendants were not precluded from raising the issue again at a subsequent stage of the case. 652 A.2d at 62–63.

In the present case, Ms. Hendel makes no claim of total repression. Indeed, she admitted in her deposition testimony and in her answers to interrogatories that she knew many of the relevant facts well before September 1, 1986. Given this level of awareness, we do not believe that Ms. Hendel's allegations that she was subjected to "social pressure" and "philosophical indoctrination" by the defendants, and that she felt economically, socially and psychologically dependent on them, are sufficient to toll the running of the statute of limitations. Were we to adopt Ms. Hendel's position, the "bright line" certainty which statutes of repose are designed to achieve would be substantially and irreparably impaired. In the absence of any meaningful limiting principle, Ms. Hendel's approach would permit any plaintiff who sues an apparently more powerful defendant—*e.g.,* an employee alleging job discrimination, or a prisoner complaining of conditions of incarceration—to claim that his fear of and dependency upon the adversary is the result of an inhibiting atmosphere created by the defendant, and that the statute of limitations should be tolled until the plaintiff was free of any pressure or dependency. Such a doctrine would, in our view, severely undermine the protections afforded by the statute of limitations.

We are aware that in *Kropinski, supra,* another case involving a former TM instructor who had sued WPEC and MIU on the basis of allegations similar to Ms. Hendel's, the court held that "it was for the jury to decide when Kropinski discovered the fraud, or reasonably should have." *Kropinski,* 272 U.S.App. D.C. at 25, 853 F.2d at 956. *Kropinski* was decided, however, on a factually different record, in part because the plaintiff introduced, and the trial judge admitted, testimony about "thought reform," [15] and in part because Ms. Hendel and Mr. Kropinski are different people, each of whom described experiences that differed in some respects from the other's.[16] Moreover, the decision in *Kropinski* predated our en banc holding in *Colbert,* in which we expounded the "inquiry notice" standard; the court in *Kropinski* did not invoke that standard or address the considerations that were to lead to our holding that the complaint in *Colbert* was time-barred. The court in *Kropinski* also failed to consider the plaintiff's claim of impaired judgment within the framework of D.C.Code § 12–302(a), which provides for tolling of the statute of limitations where a plaintiff is *non compos mentis* but not where, as here, she claims some lesser impairment. If *Kropinski* is understood as standing for the proposi-

15. The Court of Appeals apparently gave some weight to this fact on the statute of limitations issue, 272 U.S.App. D.C. at 24, 853 F.2d at 955, even though it concluded later in the opinion that the record as presented did not support admission of Dr. Singer's testimony relating to that theory.

16. If the defendants made the same remarkable representations to Mr. Kropinski that Ms. Hendel has described in this case, the court's opinion reveals few of them. Although Mr. Kropinski, like Ms. Hendel, became a teacher of TM, 272 U.S.App. D.C. at 24–25, 853 F.2d at 955–56, there is no discussion in the opinion of the inquiry notice imputable to a plaintiff who testified that she was told to *misrepresent* the truth in her own teaching of TM and that she did so.

tion that an adult plaintiff who was not *non compos mentis* could reasonably believe that transcendental meditators can do the outlandish things allegedly promised to Ms. Hendel, and that an impartial jury could reasonably find that such a plaintiff was not on "inquiry notice" that defendants' statements to that effect were false, then we respectfully decline to follow that decision.

"[T]here comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the factfinding process or to upset settled expectations that a substantial claim will be barred without respect to whether it is meritorious." *Board of Regents v. Tomanio,* 446 U.S. 478, 487, 100 S.Ct. 1790, 1797, 64 L.Ed.2d 440 (1980); *see also Bond v. Serano,* 566 A.2d 47, 50 (D.C.1989) (Farrell, J., concurring). We hold, as a matter of law, that this is a case in which that point has come.

E. *Continuing tort doctrine.*

Relying primarily on *Page v. United States,* 234 U.S.App. D.C. 332, 729 F.2d 818 (1984), Ms. Hendel contended in her opening brief that her complaint was timely under the "continuous tort" doctrine. In *Page,* a suit under the Federal Tort Claims Act, the court stated:

> It is well-settled that when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases. Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable. Moreover, since one should not be allowed to acquire a right to continue the tortious conduct, it follows logically that statutes of limitation should not run prior to its cessation.

*Id.* at 335–36, 729 F.2d at 821–22 (footnotes and internal quotation marks omitted). Ms. Hendel argued that, in conformity with *Page,* the statute of limitations did not begin to run until December 1988, when she left TM.

In their brief in this court, the defendants responded, correctly, that in *Nat'l R.R. Passenger Corp. v. Krouse,* 627 A.2d 489, 497–98 (D.C.1993), *cert. denied,* 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 30 (1994), this court declined to follow *Page* and rejected *Page*'s underlying reasoning. In *Krouse,* we held in substance that once the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the "continuous tort" doctrine inappropriate. *Id.* We relied in *Krouse* on what we characterized as the "more persuasive federal cases," including *Kichline v. Consol. Rail Corp.,* 800 F.2d 356, 358–60 (3d Cir.1986). Counsel for Ms. Hendel have made no attempt to counter defendants' citation of *Krouse* or to distinguish that case from the present one. We conclude that *Krouse* compels us to reject Ms. Hendel's "continuing violation" claim.

Ms. Hendel also argues that even if her complaint is time-barred with respect to events that occurred prior to September 1, 1986, she "should be permitted to go forward in any event, as a matter of law, with regard to injuries sustained after September 1986, since the trial court should have drawn the inference, in the summary judgment context, [that Ms.] Hendel could show incremental physical and psychological damages." Ms. Hendel candidly acknowledges that she "did not raise this question explicitly below." She asserts, however, that notwithstanding her counsel's failure to address the point, the trial judge should have inferred that "the cumulative impact of the measures [Ms.] Hendel was taking under the [defendants'] guidance ... (*e.g.,* meditating 4–8 hours a day) would make matters significantly worse as she went on and on." Ms. Hendel therefore contends that she should have been given "the opportunity, at the very minimum, to show if she can that the extra impacts during the period starting September 1986 (three years before her [c]omplaint) injured her."

Because Ms. Hendel first raised this question on appeal, we review only for plain error. *In re A.R.,* 679 A.2d 470, 477–78 (D.C.1996). Under that standard, Ms. Hendel must demonstrate that it was "plainly" or "obviously" erroneous for the judge to fail, on his own initiative, to separate the evidence of

wrongful conduct after September 1, 1986, from the rest of the case and to permit Ms. Hendel to go to trial as to the post-1986 events. *Id.* To show plain error, Ms. Hendel must also establish that a miscarriage of justice resulted. *Id.* (citations omitted).

Had it been preserved in the trial court, Ms. Hendel's contention would not be implausible. If the defendants committed fraud in 1988, a 1989 complaint alleging the 1988 fraud arguably should not be barred by a three-year statute of limitations no matter what may have occurred before 1988. In light of our decision in *Krouse,* however, we cannot say that Ms. Hendel had an "obvious" right to base her suit on any part of a continuing tort more than three years after she knew or should have known that the defendant's tortious conduct had begun and had harmed her. Moreover, in light of Ms. Hendel's involvement with TM over a period of seventeen years, it would be difficult indeed to assess the amount of harm, if any, caused by the defendants' actions after September 1, 1986. We therefore conclude that Ms. Hendel has not established a miscarriage of justice. If there was any error, it was not "plain."

### III.

### CONCLUSION

For the foregoing reasons, the judgment is

*Affirmed.*

RUIZ, Associate Judge, dissenting:

I would reverse the grant of summary judgment based on the expiration of the statute of limitations because there are material questions of fact in dispute relating to when Hendel knew, or through the exercise of reasonable diligence should have known, that she had a claim against MIU.

A cause of action generally accrues at the time the alleged injury occurs. *See Bussineau v. President & Dirs. of Georgetown College,* 518 A.2d 423, 425 (D.C.1986). The discovery rule is applied, however, to determine when a cause of action accrues, and the statute of limitations commences to run, in circumstances "where the relationship between the fact of injury and the alleged tortious conduct ... [is] obscure." *Id.* Clarifying the relevant legal test to be applied in determining accrual under the discovery rule, *Bussineau* stated that "one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Id.* at 435. When applying this test "the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances." *Diamond v. Davis,* 680 A.2d 364, 372 (D.C.1996).

To prevail on a motion for summary judgment, MIU must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Super. Ct. Civ. R. 56(c); *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C. 1994) (en banc). We review the record *de novo,* applying the same substantive standard of review utilized by the trial court. *See Walton v. District of Columbia,* 670 A.2d 1346, 1353 (D.C.1996); *Colbert, supra,* 641 A.2d at 472. The evidence must be viewed in the light most favorable to Hendel as the non-moving party, and she is entitled to "all favorable inferences which may reasonably be drawn from the evidentiary materials." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 198 (D.C.1991).

The trial court applied the discovery rule, but found that Hendel was on notice as to all of her claims before September 1, 1986; therefore, the trial court determined that MIU was entitled to judgment as a matter of law.[1] Hendel argues, however, that the dis-

1. It is not disputed that Hendel's action must be brought within three years "from the time the right to maintain the action accrues." D.C.Code § 12-301(8) (1995). On September 1, 1989, Hendel filed a seven-count complaint against MIU alleging: unfair trade practices under the D.C. Consumer Protection Procedures Act, D.C.Code §§ 28-3901-3905 (1996) (Count I); fraud and fraud in the inducement (Count II); negligent misrepresentation (Count III); negligence and willful and reckless negligence (Count IV); intentional infliction of emotional distress (Count V); professional negligence (Count VI); and, that defendants "acted intentionally, maliciously, willfully, and/or in reckless disregard for the health, safety, and welfare of plaintiff" sufficient to support punitive damages (Count VII).

covery rule tolled the statute of limitations until December of 1988, the time when she left MIU,[2] which would mean that Hendel's complaint, filed in 1989, was timely filed. If, as a matter of law, Hendel's cause of action accrued prior to September 1, 1986, as the trial court found, Hendel's complaint was properly time-barred. If, on the other hand, there is a genuine issue of material fact in dispute as to whether Hendel's cause of action accrued on or after September 1, 1986, as Hendel contends, MIU was not entitled to summary judgment based on the expiration of the statute of limitations. I conclude that to find that Hendel must have been aware of her claims prior to September 1, 1986, it is necessary to make inferences unfavorable to Hendel and to disregard evidence in the record favorable to Hendel. This is improper at the summary judgment stage because it usurps the role of the jury.

In view of our *de novo* review of summary judgment and the "highly fact-bound" nature of the discovery rule inquiry, it is necessary to scrutinize the record as a whole. The record indicates that Hendel first became aware of MIU and its programs by attending an introductory session on transcendental meditation (TM) at her junior high school student assembly in 1971, when she was fourteen years old. Later that year she participated in and learned a fifteen-minute TM meditation technique. Hendel attended her first TM residential course around 1972. After the initial exposure to TM in junior high school, Hendel became an ardent follower of MIU's practices. At some point around 1975 Hendel dropped out of high school and moved out of her family's home. She travelled to various places in the United States and around the world in the cause of TM and TM–Sidhi, until she left MIU in 1988. Throughout the seventeen years during which Hendel practiced TM techniques, ten years of which included four to eight hours of meditation a day, MIU was responsible for training Hendel and supervising her progress.[3]

Hendel alleges that MIU's misrepresentations of its programs and her participation in MIU's TM and TM–Sidhi programs caused her serious physical and emotional injuries, as well as set her back in terms of her opportunities for economically rewarding employment.[4] MIU argues, and the trial court agreed, that Hendel had an early knowledge of her injuries. In support of its ruling, the trial court twice cited Hendel's answers to Interrogatories, particularly the answer to Interrogatory nineteen, which among other things, asked Hendel to describe any examination or treatment she received for any illness listed in her answer to Interrogatory eighteen and to provide the name of the health care providers and dates of treatment.[5] Her answers contain the names and

2. Hendel also argues that the continuous tort doctrine tolled the statute of limitations. As I would deny summary judgment applying the discovery rule, I do not address the continuous tort argument.

3. The record indicates that the practices involved in TM and TM–Sidhi are a form of meditation. Yogic flying, which Hendel also practiced and is alleged as a cause of her injuries, is apparently a technique learned during the TM–Sidhi program that involves hopping while in a cross-legged position.

4. In the record Hendel describes her injuries as follows:

> By the practice of TM, I have problems with disassociation; I have problems with distortions and perception; I have memory problems; I have chronic pain in my knees and my back, especially in cold weather. I have difficulty concentrating. I have difficulty comprehending. I have problems in handling stress. I have a tendency to get sporadic cases of amnesia under intense stress.
>
> I have difficulties telling the difference between what is real and what is not real. I have problems distinguishing nighttime from daytime at times. I have problems with insomnia. I have severe nightmares. I have no advanced education, I didn't complete my BA, I have not had time to practice a career, according to those of my peer group, I have earned very little money, I am not—I have difficulty getting jobs, I have an untraceable resume, and you can read my complaint and interrogatories.

5. Interrogatory eighteen reads as follows:

> With respect to each injury, illness or disability, whether physical, mental, psychological or emotional which plaintiff allegedly received or suffered as a result of the practice of TM or the actions of any or all of the defendants describe the following:
>
> a. The date such injury, illness or disability was sustained,

addresses of forty-two health care providers that she saw between 1977 and 1989 and refers the reader to her medical records. In response to subsection (e) of Interrogatory nineteen, which asked Hendel to identify any health care professional who "concluded that any of the alleged injuries, illnesses or disabilities set forth in the answer to Interrogatory No. 18 were the result of any conduct or statement by defendants," Hendel wrote "Yes," for twenty-seven of the health care providers, at least seventeen of whom she had consulted before 1986. With respect to five others she saw between 1984–87, she responded that "I don't recall at this time."

The majority agrees with the trial court's interpretation of Hendel's answers to mean that Hendel not only consulted numerous health care providers but that a number of these providers "concluded that her problems were the result of the defendants' alleged conduct and the Plaintiff's practice of TM." Applying an objective standard, the trial court concluded that as a result of these consultations Hendel "would have acquired sufficient information" to bring her claim before September 1, 1986. Later in its order the trial court summarized Hendel's answer to Interrogatory nineteen and concluded:

> It can *reasonably be inferred* that these medical and health care professionals imparted sufficient facts and advice to Diane J. Hendel to put a reasonable person on notice that her alleged injuries, psychological and physical, were causally related to her practice of Transcendental Mediation and her participation in the TM–Sidhis program. Thus, by any objective standard she should have known facts during this time period sufficient to justify the filing of the claims which she did not ultimately file until September 1, 1989.

(Emphasis added.)

I disagree with the trial court's and the majority's reading of Hendel's answer to Interrogatory nineteen. In particular, her response to subsection (e), is anything but clear. It is not apparent that by answering "Yes," Hendel meant to indicate that the health care providers listed informed her *at the time of the visit*, or gave her sufficient information to put her on notice that her injuries were a result of her participation in MIU's programs. The trial court inferred "Yes" to mean that the providers gave Hendel enough information linking her practice of TM to her injuries. This inference is unfavorable to Hendel, and is therefore improper in considering summary judgment. *See Sherman v. District of Columbia*, 653 A.2d 866, 869 (D.C.1995). Further, it is not supported by other evidence of record.[6]

b. The nature and extent of the injury, illness or disability,
c. Whether or not plaintiff has fully recovered from the injury, illness or disability,
d. The nature and extent of any remaining injury, illness, or disability.

Interrogatory nineteen reads as follows:

Describe all examinations, treatments, evaluations, or other care or attentions you have received from physicians, surgeons, osteopaths, chiropractors, clinics, hospitals, psychiatrists, psychologists or other health care professional for any injury, illness or disability stated in Interrogatory No. 18 and identify:

a. Each health care provider,
b. The date or dates of examination, treatment or evaluation,
c. The nature, purpose and extent of each such examination, treatment or evaluation,
d. The prognosis made by said health care professional and
e. Any health care professional described above in subpart (a) who concluded that any of the alleged injuries, illnesses or disabilities set forth in the answer to Interrogatory No. 18 were the result of any conduct or statement by defendants.

6. In her deposition Hendel was asked who told her that her insomnia was caused by her practice of TM. She replied, "The doctors that I listed earlier." The trial court cited this answer to support its inference that the doctors Hendel saw prior to 1986 told her that the practice of TM was related to her injuries. The record does not make clear, however, the identity of the doctors to whom Hendel referred or when she saw these doctors.

Further, Hendel's affidavit states that MIU has:

> alleged that from 1980 to 1983, 17 doctors had told me that my alleged injuries were attributable to TM. However, these doctors, whom I list in Answer to Interrogatories # 11 [sic, 19], were either (1) TM "doctors," such as Dr. Tri Guna, who prescribed powders for dysentery and "unstressing", etc., (2) acupuncturists or chiropractors who treated me for ongoing dysentery problems, or knee and back problems, from "Yogic flying," or (3) medical professionals whom I consulted about ongoing dysentery problems, such as Kavin Cahill, M.D., a parasitologist.

In addition to Hendel's medical consultations, the trial court also cited numerous exchanges in Hendel's deposition testimony where she noted that she was having "problems" while practicing the TM–Sidhi program in 1979 as indicative of her knowledge of her injuries more than three years before she filed her complaint.[7] All of Hendel's answers are inconclusive at best and insufficient, at this stage of the proceeding, to support a finding that Hendel was on notice of her claims prior to September 1, 1986. Although Hendel acknowledges that she started to experience problems after beginning the TM–Sidhi program, when asked if at the time she was practicing TM and TM–Sidhi she related the problems to the practices, she replied she "wasn't sure," but she felt that "unstressing" was causing the problems. Hendel stated that when she started the TM–Sidhi program in 1979 she was aware that other people also experienced uncomfortable feelings during "unstressing."

Being aware of when physical and mental changes and "problems" started to occur, however, is not the same as saying that Hendel, or a reasonable person in Hendel's circumstances, would relate the problems she was experiencing to some tortious conduct associated with the practice of TM as taught by MIU. Hendel alleges that when she mentioned these unpleasant changes and experiences to MIU instructors, including the head of the program, Mahesh Yogi, these individuals insisted that the effects were beneficial. In her affidavit Hendel alleges:

> 3. I had complete reliance on [MIU] for news. When I went to [MIU] about my "problems," [MIU] said something good was happening, that I was purifying. [MIU] interpreted hallucinations as "celestial perceptions"; they interpreted my world, including every symptom I was experiencing. [MIU] never acknowledged that I had any "problem" such as anxiety, disorientation, confusion, insomnia. On the contrary, [MIU] assured me that these "symptoms" were beneficial signs of "unstressing," and that I was progressing toward higher consciousness.
>
> * * * *
>
> 8. Lapses in memory, and other such mental states that I now consider problems, were, while I was in the TM movement, not characterized by me or other TM adherents as "problems" or "injuries." Indeed, Maharishi Yogi taught that development of consciousness was superior to intellectual processes, and especially for meditators like me, my goal was meditation, and that other mental activities, such as memory, were irrelevant. Therefore, what I view in retrospect as mental problems, such as memory problems, were then considered by me and others, as instructed by the TM organization, as a positive state.

Hendel's answer to Interrogatory eleven indicates a similar reliance on MIU and reassurance from MIU that her physical and mental changes were in the normal course of the TM experience:

> Mahesh Yogi continually repeated that discomfort and negative experiences were good. Specifically, he stated that hallucinations, headaches, head pressure, depression, physical movements, vision problems, rage, violence, mood swings, disorientation, forgetfulness, lack of energy, ringing in the ears, seeing light in the head with eyes closed and blackouts were good experiences. He always stated "something good is happening" whenever questioned by TM participants who were having these experiences. He further stated that these experiences were necessary and were the result of TM and unstressing. He always advised individuals to endure and be strong and courageous.

The trial court apparently concluded that Hendel knew that TM caused unfavorable reactions because Hendel "acknowledge[d]

7. At one point during the deposition, Hendel indicated that she had problems with her memory, judging distances and handling stress and that she has had all of these problems since she started the TM–Sidhi program in 1979. Later in the deposition Hendel was asked if she had any problems with unstressing or any psychological or emotional problems during the courses. She indicated that she had; her problems included being anxious, disoriented, confused and she had nightmares and insomnia. During her deposition Hendel discussed having some type of seizure while in India sometime around 1980 during a lunch break from her Vedic Science course.

hearing that people who were practicing the sidhis or TM 'were flipping out' in the late 1970s and in spite of that she went on to become a teacher of TM."[8] As was the case with the changes she herself had experienced, however, Hendel did not acknowledge that the practice of the TM–Sidhi program would be harmful to her students.[9] Reading the deposition as a whole, and making reasonable inferences in Hendel's favor, as we must, Hendel's statements indicate that although Hendel was aware of a rumor that certain people who practiced TM "flipped out," she did not believe the rumor to be true as apparently she did not include herself in the group of teachers who were "teaching with the knowledge that the practice would not be helpful." Her affidavit restates this position a little differently: "Even though I and other meditators had heard rumors that some individuals were 'flipping out,' we understood, within the context of the TM organization, that the individuals were unstressing, a normal by-product of the practice of TM."

The trial court also concluded that Hendel was put on notice regarding her allegations of fraud and negligent misrepresentation when she did not attain promised results within the time period that had been specified for their attainment. Hendel's complaint alleges that MIU fraudulently and negligently represented that the practice of TM would, among other benefits, reduce stress, improve memory, reduce depression, anxiety and emotional disturbances, promote better social relations, lead to the attainment of personal enlightenment, confer the ability to promote world peace and improve society. Some or all of the benefits, including enlightenment, were to be attained two or three years after beginning the practice of TM.

The trial court treated Hendel's statement in her deposition that she did not reach enlightenment within two or three years and did not know of anyone who had, as a concession sufficient to put her on notice of her claim of fraud. Undermining the trial court's view, however, is Hendel's testimony that she was repeatedly told that she needed to meditate harder or participate in a new course in order to attain the promised results. In addition, she also indicated that MIU changed the definition of "enlightenment," thereby making it more difficult for her to know how and when she would attain it.

The trial court similarly noted that other promises made, but not kept, by MIU put her on notice of the potential fraud claims against MIU well before 1986. Specifically, Hendel was promised that the practice of TM would not change her lifestyle, but Hendel admitted that many things did change after she started practicing TM and TM–Sidhi.[10] Hendel admitted she did not attain the benefit of improved memory and even began to experience problems with her memory. In addition, Hendel never achieved the promised ability to fly, become invisible or walk through walls and never knew anyone who could do these things.[11]

Understandable as the trial court's skepticism of Hendel's claim of ignorance at the time may be, it is up to the jury to resolve

**8.** The trial court's view is based on the following exchange:

Q. [Y]ou heard rumors that people who were practicing the sidhis or TM were flipping out; is that correct?
A. Yes.
Q. And you knew that in the late '70s; is that correct?
A. Yes.

**9.** The following exchange occurred immediately preceding the statement relied on by the trial court:

Q. Was there anyone else who was a teacher of TM or the TM sidhis programs that you believed was teaching with the knowledge the practice would not be helpful?
A. Yes.
Q. Who else?
A. Everyone I know.

* * * * * *

Q. Did that include yourself?
A. I didn't believe so at the time.

**10.** As noted earlier, Hendel began to experience difficulty remembering things and judging distances and had problems handling stress after starting to practice TM–Sidhi.

**11.** In her deposition Hendel referred to an article in an Indian newspaper she read while in India during 1980–81 about problems with dishonesty of the Maharishi Mahesh Yogi. The trial court also relied on this information in concluding that Hendel was on notice of her claims for fraud and misrepresentation.

disputed issues of material fact and credibility. It is evident from the record that there is a dispute as to when Hendel connected the problems she was experiencing with MIU's alleged tortious conduct. The trial court correctly noted that Hendel's actions had to be viewed against an objective standard. The precise question, however, is what a reasonable person would have done *under Hendel's circumstances.* *See Diamond, supra,* 680 A.2d at 372. The record reveals that Hendel's circumstances were rather special; what would have been obvious to others may not have been clear to her.

In a similar case, *Kropinski v. World Plan Executive Council–U.S.,* 272 U.S.App. D.C. 17, 853 F.2d 948 (1988), the court upheld the denial of the defendants' motion for summary judgment on a fraud claim based on the statute of limitations because the district court "properly concluded that it was for the jury to decide when Kropinski discovered or, under the exotic circumstances of this case, should have discovered the fraud." *Id.* at 24, 853 F.2d at 955. Like Hendel, Kropinski had engaged in the practice of TM for numerous years and alleged that when he mentioned the changes to his physical and mental state MIU reassured him that "something good was happening." *Id. Kropinski* noted that a plaintiff in such circumstances might be "lulled" into inaction, and stated that "the running of the statute is tolled beyond the discovery date if the tortfeasor reassures the victim that the negative effects should be expected as part of the treatment, and if a reasonable person would believe such reassurances." [12] *Id.* In assessing the circumstances relevant to a person's knowledge, we consider the person's reliance on individuals they trust. *See Diamond, supra,* 680 A.2d at 372. Hendel was not only a dedicated practitioner and teacher of TM; she became an adherent at an early age when she may have been more susceptible than most to rely on facially incredible claims and assurances. Because there are material facts in dispute, I would reverse the summary judgment granted on the ground that Hendel's claims were barred because she must have had knowledge of her claims prior to September 1, 1986.

12. Here, the trial court concluded that the evidence Hendel presented to support a lulling theory was insufficient to create a material issue of fact. Again, the trial court relied on Hendel's ambiguous answer to Interrogatory nineteen. The trial court stated:

> [Hendel] consulted at least 17 health care professionals between 1980 and 1985 in India, Colorado, New York, Washington, D.C., Silver Spring, Md., Alexandria and Annandale, Va., Iowa and in California. The extent of this travel and consultation with health care professionals certainly afforded her the opportunity to have consulted with a lawyer and to have brought a lawsuit long before September 1, 1986. It also undercuts thoroughly the claimed basis for an estoppel or lulling theory to apply.